STATE EX REL. HUGH MULHERN *v.* MALCOLM McHENRY
ET AL.

| SUPERIOR COURT | NEW HAVEN COUNTY | FILE NO. 137473 |
| --- | --- | --- |
| | AT NEW HAVEN | |

Memorandum filed June 19, 1974

 

*Donahue & Votto,* of West Haven, for the plaintiff.

*Farren & King,* of New Haven, for the named defendant.

*Peter C. Dorsey,* Hamden town attorney, for the defendants DiMeo et al.

JOHN F. SHEA, JR., J. This is an action in the nature of quo warranto to determine title to the office of chief of police of the town of Hamden. The action was originally instituted, on behalf of Hugh Mulhern, requiring Malcolm McHenry and officials of the town of Hamden to show by what right McHenry claimed to hold the office of chief of police. A counterclaim and cross complaint, also in the nature of quo warranto, was filed by representatives of the town, seeking to determine who rightfully holds the office of chief of police, Mulhern or McHenry. By agreement of the parties, the issues are to be resolved on the counterclaim and cross complaint.

Hugh Mulhern was appointed chief of police of Hamden in September, 1967. He continued in that office, without question, until December 27, 1973. On that date, the retirement board of the town of Hamden purported to order his retirement, effective January 1, 1974. On the same date, a vacancy pur-

portedly existing in the office as of January 1, 1974, the then mayor of Hamden, William Adams, appointed Malcolm McHenry to the office of chief of police as of January 1, 1974.

On November 3, 1964, pursuant to chapter 99 of the General Statutes, the town of Hamden adopted a municipal charter, effective January 1, 1966. Section 17-7 of the charter provided for the continuation of the Hamden Employees Retirement Act, which had been adopted on May 8, 1962. The act was amended in 1969. Under its provisions, members of the police and fire departments are defined as "Guardian Employees." The act provides that the "normal retirement date" of such an employee shall be "the first day of the calendar month next following the 60th anniversary of his birth, or the completion of 25 years of credited service, whichever is earlier."

On December 27, 1973, Mulhern had twenty-eight years of credited service and was fifty-six years of age. The retirement board involuntarily retired Mulhern under the purported authority of § 4 (1) (a) of the Employees Retirement Act, which provides, in part, as follows: "A member shall be retired from service on a normal retirement allowance upon reaching his normal retirement date. However, with the approval of the Board, a member may defer his retirement and remain in service after his normal retirement date provided, however, that in no event shall retirement be deferred beyond age 65, in the case of a guardian employee, or age 70 in the case of a service employee."

As of the date the retirement board acted, Mulhern had made no formal request for a deferment although he had completed twenty-five years of service some three years earlier. Testimony at the trial indicated that the custom followed was not to

require a request for deferment unless the employee had reached sixty years of age. The basis for granting a deferment was the ability to pass a physical examination. There was no other guideline. After age sixty, guardian employees were required to take physical examinations each year, to extend their deferments to age sixty-five.

Prior to the retirement of Mulhern on December 27, 1973, no guardian employee had ever been involuntarily retired on the basis of years of service alone. On December 27, 1973, there were approximately twenty other guardian employees who had completed twenty-five years of service. This group included many of the top supervisory officers of the police and fire departments. Mulhern was the only one who was involuntarily retired by the board. As evidence of recognition of the custom that formal requests for deferment were not received until the employee reached age sixty, the motion passed by the retirement board in retiring Mulhern contained the following language: ". . . it is the sense of this Board that no deferment of normal retirement date be approved for said Chief Mulhern, and that any deferment assumed to previously have been approved should be terminated."

Counsel for Mulhern argue that the action of the board in involuntarily retiring him amounts to an invidious discrimination in violation of his rights under the equal protection clause of the fourteenth amendment to the constitution of the United States. It is argued that Mulhern was singled out, as a member of an ordained class of employees with over twenty-five years of service, for selective and discriminatory treatment. It is not contested that Mulhern's years of service provided the sole basis of the board's action in ordering his retirement. No other reason was given.

The intent of the equal protection clause is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by the express terms of a statute or by its improper execution. "An actual discrimination arising from the method of administering a law is as potent in creating a denial of equality of rights as a discrimination made by law." 16 Am. Jur. 2d 929, Constitutional Law, § 540.

The basic principle requiring that equal protection of the laws extends to the application of the law was enunciated long ago in *Yick Wo* v. *Hopkins,* 118 U.S. 356, 373: "Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution."

The necessity of requiring that government officials exercise their powers so as not to discriminate was set forth in *Railway Express Agency, Inc.* v. *New York,* 336 U.S. 106, 112: "Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected. Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation."

In a situation similar to the one at hand, it has been held that compulsory retirement of municipal civil service employees can be accomplished only by a general, nondiscriminatory ordinance which operates uniformly and equally upon all members of

the class created by the ordinance. *Commonwealth ex rel. Siani* v. *Wilkes-Barre,* 164 Pa. Super. 529; see *Boyle* v. *Philadelphia,* 338 Pa. 129.

Counsel for McHenry correctly argue, however, that the unlawful administration of a statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present an element of "intentional or purposeful discrimination." See *Snowden* v. *Hughes,* 321 U.S. 1, 7. It is therefore necessary to look closely at the circumstances surrounding the involuntary retirement of Mulhern.

The November, 1973, town election in Hamden resulted in a change of administration. At the time of the meeting of December 27, 1973, Mayor Adams, who served as chairman of the retirement board by virtue of his office, was in effect a lame duck mayor slated to leave office on January 1, 1974. Adams, who wanted Mulhern to retire, discussed the question of retirement with Mulhern some months prior to the December meeting, but there was no decision on Mulhern's part to retire. Adams, who was a very candid witness at the trial, freely admitted that in the event there was a vacancy in the office of police chief, he wanted the privilege of appointing the new chief and did not want to leave the appointment for his successor in office. Adams requested and obtained an opinion from the town attorney that on the basis of Mulhern's years of service an involuntary retirement could be effected. This would create a vacancy and permit Adams, under the powers granted by the Hamden charter, to appoint a new chief.

Adams then arranged to have the members of the retirement board contacted to see how they would vote on a motion to retire Mulhern involuntarily.

Adams became aware that he might be one vote shy of the number needed to pass the motion. There was, however, a vacancy on the retirement board. Adams then discussed the situation with his administrative assistant, Donald Byers. Having obtained a commitment from Byers to vote for Mulhern's retirement, Adams arranged to appoint Byers to fill the vacancy. On December 26, 1973, a notice was filed for a meeting of the retirement board the following day. Byers was sworn in as a member of the board on December 27, shortly before the start of the meeting. At the meeting, Byers made the motion to retire Mulhern involuntarily. No advance notice was given to Mulhern of the intended action. He was not aware of the board's intention until he received an unofficial call on the afternoon of the meeting. He received no official notice until a letter was hand-delivered to his home on the evening of December 27, 1973, advising him that he had been retired.

As evidence that Byers was handpicked by Adams to serve on the board for the sole purpose of being the instrument of forcing Mulhern's retirement, it is interesting to note that Byers resigned from the board on December 28, 1973, the day following the meeting.

Mayor Adams was aware that there were other guardian employees in active service with more than twenty-five years of service. Only Mulhern, however, was singled out for involuntary retirement.

It is difficult to visualize a case in which there would be greater evidence of "intentional or purposeful discrimination." The court holds that Mulhern, as a member of a class of guardian employees with more than twenty-five years of service, was singled out for discriminatory treatment and was

denied the equal protection of the laws, in violation of his constitutional rights. It is not necessary to discuss the other issues raised by the parties.

The purported involuntary retirement of Mulhern by the retirement board on December 27, 1973, was invalid. It follows that there was then no vacancy in the office of the chief of police. Therefore the purported appointment of McHenry as chief of police by Mayor Adams was ineffective and invalid.

It is the opinion of the court that Hugh Mulhern is lawfully entitled to the rights, powers and privileges of the office of chief of police of the town of Hamden.