[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Electrical Contractors, Inc. (ECI) has appealed from the decision of the Deputy Commissioner of the Department of Labor dated June 30, 1989, where ECI was found to have disregarded its obligations under Connecticut General Statutes 31-53. Pursuant to Connecticut General Statutes 31-53a
the Deputy Commissioner ordered that the name of ECI appear on d list of firms found to have disregarded their obligations under31-53.
Under the provisions of 31-53a, such list is distributed by the Labor Commissioner to all departments of the State of Connecticut and political subdivisions thereof. No contract shall be awarded to any firm on such list by the state or any of its political subdivisions until three years after the publication of such list. The placement of a name on the aforementioned list is commonly referred to as "debarment".
The Deputy Commissioner found that ECI had disregarded its obligations under 31-53 by not paying the customary or prevailing rate of wages in that it failed to pay its employees in full on a weekly basis including overtime wages and failed to pay its .apprentice employees the proper amount of benefit contributions payable and by not keeping, maintaining and preserving true and accurate records.
ECI seeks to reverse the Deputy Commissioner's decision based on the following grounds: 1) its failure to pay overtime wages required by Connecticut General Statutes 31-76c did not violate31-53; 2) it properly calculated payments due to apprentices; 3) a failure to keep proper records is not a ground for debarment; 4) it did keep proper records; 5) its conduct did not constitute a disregard of its obligations to employees within the meaning of 31-53a, and; 6) the Labor Department's debarment complaint against ECI constituted selective enforcement resulting in a denial of equal protection.
The Deputy Commissioner's findings of fact are summarized below.
On June 11, 1986, ECI entered into a contract with the State of Connecticut to install electrical smoke and fire alarms in dormitories at the University of Connecticut in Storrs, Connecticut ("the UConn project"). Prior to entering into the contract ECI signed a "Contractor Wage Certification Form" in which it certified that it and its subcontractors would pay all workmen on the UConn project the wages listed in the schedule of prevailing rates, which was attached to the form. Those prevailing rates were set by the Labor Commissioner based on federal prevailing wage rates CT Page 2171 pursuant to Connecticut General Statutes 31-53(d). The Labor Commissioner has used federal prevailing wage determinations for public works contracts since 1977. The prevailing rate schedule for ECI's UConn project contract contained an hourly wage rate for each job classification, as well as a separate amount under each classification for "total benefits".
In 1983 the Labor Department sent ECI copies of three letters which provided that apprentices were to be paid based on a percentage of the journeyman's hourly wage rate plus the amount of fringe benefits listed on the prevailing wage schedule. ECI paid apprentices on the UConn project by adding the journeyman's wage rate to the fringe benefits rate and multiplying the total by the applicable apprenticeship percentage. ECI had calculated the wages due to apprentices in a similar manner on two state projects in 1984. The Labor Department reviewed the wage records on those projects and did not object to ECI's method of calculating payments to apprentices.
ECI commenced work at the UConn project in March, 1987. During the second or third week of that month, ECI advised its employees that it intended to suspend work on the UConn project from May 9th to May 18th. To make up for that week ECI requested its employees to work 48 hours per week for a five week period during which they would be paid for 40 hours per week. Workers would not be paid for the eight hours of Friday work in the paycheck for that week. Instead, they would be paid for a 40 hour work week at straight time during the period of the job shutdown.
During the seven week period from the week ending March 21, 1987, through May 2, 1987, ECI employees at the UConn project worked 10 hours per day Monday through Thursday and 8 hours per day on Friday, for a total of 48 hours per week. During this period, employees who worked 48 hours were paid only 40 hours in their weekly paycheck.
ECI's foreman at the UConn project maintained two sets of records concerning hours worked. One set failed to indicate that ECI employees had worked on Fridays during the period of the week ending March 28, 1987 through May 2, 1987. The other set of records did indicate the Friday hours worked during that period.
On April 23, 1987, Glen Remondi, one of the ECI employees at the UConn project, signed an affidavit which stated that he and other ECI employees had worked 48 hours per week for 6 weeks and had been paid only for 40 hours per week. The affidavit was subsequently delivered to the Labor Department which commenced an investigation. As a result of the investigation, the Labor Department determined that 17 ECI employees at the UConn project had not been paid overtime for hours worked in excess of 40 hour CT Page 2172 for a 7 week period, and that 8 ECI apprentice employees had been underpaid in the "total benefits" portion of their hourly wage rate. The total amount owed to said employees was $5376.19. The Labor Department requested ECI to issue checks in that amount to the employees in question, and it did so on June 26, 1987.
ECI claims to be aggrieved by the decision of the Deputy Commissioner based on the allegation that it is a contractor which does a substantial amount of work for the State of Connecticut and its political subdivisions. The Labor Department has admitted this allegation. Therefore, this Court finds that ECI is aggrieved by the decision of the Deputy Commissioner in that the placement of its name on a debarment list will cause it to lose revenues. ECI has a specific, personal and legal interest in the subject matter of the decision which will be specially and injuriously affected by the decision. Mystic Marinelife Aquarium Inc. v. Gill, 175 Conn. 483, 493, 400 A.2d 726 (1978); Old Rock Road Corporation v. Commission on Special Revenue, 173 Conn. 384, 387,377 A.2d 1119 (1977).
FAILURE TO PAY OVERTIME RATES
Connecticut General, Statutes 31-53(a) requires that employees in public works projects receive wages "at a rate equal to the rate customary or prevailing for the same work in the same trade or occupation in the town in which such public works project is being constructed." The plaintiff argues that a failure to pay overtime wages required by 31-76c does not violate 31-53 because31-53 contains neither a reference to hours worked, nor a specific incorporation of 31-76c.
The Deputy Commissioner held that ECI's failure to pay its employees an amount equal to one and one-half times their regular hourly rate for weekly hours worked in excess of 40 did violate31-53 because payment of such wages, mandated by 31-76c:, is customary in the trades in which ECI employees work. This Court agrees with that holding.
Section 31-76c has required payment to employees for overtime hours at the rate of one and one-half times their hourly rate since 1969. Therefore, such payment was clearly customary or prevailing in the trade of the ECI workers on the UConn project. In construing a statute, words are to be given their ordinary meaning. Jones v. Civil Service Commission, 175 Conn. 504, 509, 400 A.2d 541
(1972). In addition, a statute should be construed in light of its purpose. Zichichi v. Middlesex Memorial Hospital204 Conn. 399, 405, 528 A.2d 805 (1987); Caulkins v. Petrillo,200 Conn. 713, 716-17, 513 A.2d 43 (1986). As the Deputy Commissioner stated, ECI's failure to pay its employees overtime had the tangible effect of depriving workers of a payment that 31-53 is CT Page 2173 meant to guarantee.
The Deputy Commissioner further found that overtime obligations are incorporated by reference in 31-53. Section 31-53(f) provided that Connecticut General Statutes 31-59(a), 31-59(b), 31-66, rand 31-69 apply to 31-53 unless inconsistent. Sections 31-59(a) and (b) authorize the Labor Commissioner to investigate "for the purpose of ascertaining whether the provisions of this part . . . are being complied with . . ." (emphasis added). Section 31-69(b) provides for penalties against any employer who pays an employee less than the rates due under the "provisions of this part". Under31-60 (a) any employer who pays an employee "less than the minimum fair wage or overtime wage shall be deemed in violation of the provisions of this part" (emphasis added). Sections 31-59, 31-60
and 31-69 are all in Part I of Chapter 558 of the Connecticut General Statutes.
When the four statutory provisions referenced in the foregoing paragraph are taken together it appears that the 31-53
reference to the investigative provisions of 31-59 and the enforcement provisions of 31-69 was intended to incorporate the overtime provisions of 31-60. Such a construction follow the principle that statutes are to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a consistent body of law. State v. Murtha, 179 Conn. 463,466, 427 A.2d 807 (1980); Heffernan v. Slapin, 182 Conn. 40, 46,438 A.2d 1 (1980).
 FAILURE TO PAY THE APPROPRIATE AMOUNT TO APPRENTICES
The plaintiff claims that it did not fail to pay the appropriate amounts to apprentices because it had no knowledge of how those amounts should be calculated. It further claims that the Labor Department had previously failed to object to its method of calculation of payments to apprentices. ECI does not claim specifically that such failure estops the Labor Department from enforcing the law regarding payment to apprentices. However, the practical effect of ECI's argument is that such estoppel should be applied.
The Labor Department claims that the proper method of payment to apprentices is established in three sources: 1) the prevailing wage rate schedule issued to ECI for use on the UConn project; 2) three letters received by ECI in 1983 from the office of Job Training and Skill Development, Labor Department, and 3) Code of Federal Regulations, 29 D.F.R. 5.5(a)(4)(i).
On June 3, 1986, ECI's vice president signed and swore to truth of a Contractors Wage Certification Form in which ECI CT Page 2174 certified that all workers on the UConn project would be paid in accordance with the aforementioned prevailing wage rate schedule. That schedule contained a dollar amount for "hourly rate" and "total benefits" for 43 separate job classifications. The schedule provided that apprentices may be "paid the appropriate percentage of the prevailing journeyman rate . . . ". It also provided, "Any contractor or subcontractor not obligated by agreement to pay to the welfare and pension fund, shall pay this amount to each employee as part of his hourly wage." The Labor Department contends that the words "this amount" in the foregoing sentence refers to the total benefits amount. Thus, it argues, apprentices should be paid based on a percentage of the journeyman hourly rate and the full amount of the journeyman "total benefits". ECI paid apprentices based on a percentage of both the hourly rate and total benefits.
The provisions for payment of apprentices in the prevailing wage schedule can be interpreted in the manner urged by the Labor Department. However, the meaning of those provisions is not clear.
The three letters from the Office of Job Training sent to ECI in 1983 contain clear language concerning apprentice payment. Each letter provides:
 The apprentices must be paid the percentage of the program completion rate which is $8.00 or the project journeyman's rate, whichever is higher, plus the amount of fringe benefits listed on the wage determination for the classification.
 Each apprentice program sponsor must meet the requirements of Labor Department regulations on Equal Opportunity in Apprenticeship per C.F.R. § 29 Part 5.
The above language clearly establishes the payment method to apprentices which is urged by the Labor Department. The federal regulations reference therein also supports such payment method.29 C.F.R. § 5.5 (a)(4)(i) provides:
 If the apprenticeship program does not specify fringe benefits, apprentices must be paid the full amount of fringe benefits listed on the wage determination for the applicable classification.
The federal regulations are applicable because 31-53(d) permits the Labor Commissioner to adopt and use prevailing wage determinations made by the Secretary of Labor of the United States under the provisions of the Davis-Bacon Act. The Labor Department introduced evidence that it has used federal prevailing wage CT Page 2175 determinations since 1977 pursuant to 31-53(d).
ECI argues that the adoption of the federal prevailing wage rates constituted an invalid regulation in violation of Connecticut General Statutes 4-168. In support of that argument ECI cites the cases of Persico v. Maher, 191 Conn. 384, 465 A.2d 308 (1983), and Salmon Brook Convalescent Home v. Commission on Hospitals and Health Care, 177 Conn. 356, 417 A.2d 358 (1979).
Those cases held that "guidelines" or "directives" of a state agency were being applied improperly as regulations without having been properly adopted under 4-168. They are distinguishable from this case. In Persico and Salmon Brook the substance of the guidelines and directives had not been delineated by the legislature. Therefore, the agency was attempting to exercise authority which had not been specifically delegated to it by the legislature. In this case, the authority to adopt federal prevailing wage guidelines was specifically delegated to the Labor Commissioner by the legislature as an alternative to holding "a hearing . . . to determine the prevailing rate of wages on an hourly basis and the amount of payment or contribution paid or payable on behalf of each employee to any employee welfare fund . . ." 31-53(d). In light of such specific authorization, the Labor Commissioner was not required to engage in the regulation-making procedure of 4-168. Moreover, ECI has had knowledge of the Labor Department's adoption of the federal prevailing wage rates and regulations since 1983. It could have instituted an action to contest the validity of such adoption as an invalid regulation pursuant to 4-168(h). It did not do so.
ECI argues, essentially, that the Labor Department should be estopped from applying the correct method of calculation of apprentice payments because it previously failed to object to ECI's method of apprentice payment. The Deputy Commissioner found that in 1984 a Labor Department wage enforcement agent had reviewed ECI's wage records on two state projects and had found no violations. ECI calculated apprentice payments on those projects in the same way it calculated them on the UConn project. The Deputy Commissioner further found that ECI had not produced any evidence that it had relied on the Labor Department's failure to object to its manner of calculating apprentice payments in 1984.
A party invoking the claim of estoppel against a government agency must prove the following: 1) that the agency did or said something calculated to induce the party to believe that certain facts exist and to act on that belief 2) that the party has changed his position in reliance on those facts, thereby incurring a loss Zoning Commission v. Sescynski, 188 Conn. 724, 731, 453 A.2d 1144
(1982); 3) that the government agent inducing the detrimental reliance had authority to do so 4) that special circumstances CT Page 2176 exist which make it highly inequitable or oppressive to enforce the applicable law. West Hartford v. Rechel, 190 Conn. 114, 121459 A.2d 1015 (1983); 5) that he exercised due diligence in ascertaining the legality of his conduct; and 6) that he not only lacked knowledge of the true state of things, but also had no convenient means of acquiring that knowledge. Greenwich v. Kristoff,2 Conn. App. 515, 522, 481 A.2d 71 (1984); Zotta v. Burns,8 Conn. App. 169, 511 A.2d 373 (1906).
A review of the record indicates that ECI failed to introduce any evidence as to the second through sixth elements set forth above. Therefore, this Court cannot find that the Labor Department's failure to correct ECI's method of calculating apprentice payments estops it from enforcing the proper method of payment.
FAILURE TO KEEP PROPER RECORDS
The Deputy Commissioner held that ECI failed to keep wage and hour records in accordance with the regulations issued by the Labor Commissioner to assure proper payments due to employees and that such failure constituted a disregard of its obligations under31-53. This holding was based on the finding that ECI maintained a set of records which made false representations about hours worked and compensated.
ECI claims that failure to keep proper records is not a ground for debarment because no regulation concerning recordkeeping was promulgated pursuant to 31-53 and because the recordkeeping requirements of 31-53 are not "obligations to employees" within the meaning of 31-53 and 53a. The Court disagrees.
Section 31-53(f) requires each employer to keep records of each employee's wages and hours in a manner and form established by the Labor Commissioner to assure the proper payments to employees. That Section specifically incorporates 31-66, which provides:
 Each employer . . . shall keep . . . a true and accurate record of the hours worked by, and the wages paid by him to, each employee, as required by the applicable regulations issued by the labor commissioner . . . . Such records shall be open to inspection by the commissioner or his authorized representative at any reasonable time. Each employer . . . shall keep a copy of . . . the regulations issued by the labor commissioner posted at the place of employment where it can be read easily by the employees. Employers shall be furnished copies of orders and regulations on request, without charge. CT Page 2177
The regulations referred to in the foregoing statute were promulgated by the Labor Commissioner pursuant to 31-60 in the form of Regs. 31-60-12a and 31-60-12c. Those regulations require that the employer keep true and accurate records for each employee for three years and that those records include each employee's total daily and total weekly hours, his total hourly, daily or weekly wages, his overtime wages as a separate item from his basic wages, and his total wages paid each pay period.
The provisions of regulations 31-60-12(a) and 31-60-12(c) appear to be sufficient in "manner and form" to assure proper payments to employees under 31-53. Therefore, the Labor Commissioner had no need to adopt separate recordkeeping regulations addressed only to 31-53. The legislature's incorporation of31-66 in 31-53(f) indicates its intent to avoid such duplicative recordkeeping regulations.
It is clear from the language of 31-53(f) and 31-66 that the recordkeeping obligations imposed by those statutes run directly to benefit employees. The language of 31-53(f) indicates that recordkeeping obligations are to insure proper payments to employees. Section 31-66 provides that the recordkeeping regulations be posted so that employees can easily view them. Without the posting of the regulations, employees might well be unaware of their requirements and, thus, unaware of violations of the regulations. Without proper recordkeeping, the Labor Department's ability to investigate and ascertain underpayments to employees would be significantly impaired.
The recordkeeping requirements of 31-53(f) are "obligations to employees" within the meaning of 31-53a. When the legislature enacted 31-53a it was aware of the recordkeeping obligation imposed by 31-53(f). The legislature is presumed to have acted with knowledge of existing law with the intention to create one consistent body of law. Thornton Real Estate, Inc. v. Lobdell,184 Conn. 228, 230, 439 A.2d 946 (1981). If the legislature had wished to limit the application of debarment to the failure to pay prevailing wages, it could have done so. See Buonocore v. Branford, 192 Conn. 399, 403, 471 A.2d 961 (1984).
Section 31-53a-1(b) defines "disregarded their obligations" to include "the failure to keep, maintain and preserve such records relating to the wages and hours worked by each employee . . . in such manner and form as the labor commissioner establishes to assure the proper payments due to such employees." Courts generally accord great deference to a construction given a statute by the agency charged with its enforcement. Griffin Hospital v. Commission on Hospital and Health Care, 200 Conn. 489, 496-7,512 A.2d 199 (1986) Anderson v. Ludgin, 175 Conn. 545, CT Page 2178400 A.2d 72 (1978).
ECI has also claimed that it did keep accurate records, which did not misrepresent the hours worked and wages paid on the UConn project. The Deputy Commissioner found that ECI maintained two sets of records. One set contained no indication that ECI employees had worked on Fridays during the period of the week ending March 28, 1987 through May 2, 1987. The second set of records did indicate Friday hours during that same period. The Deputy Commissioner found that ECI showed only the first set to the Labor Department investigator, thereby misrepresenting the true hours worked and omitting any reference to the overtime hours worked. The record contains sufficient facts to support that
Based on the foregoing, the Deputy Commissioner correctly concluded that ECI had failed to maintain proper records and that such failure constituted the disregard of an obligation to employees within the meaning of 31-53a.
DISREGARD OF ECI'S OBLIGATIONS
ECI acknowledges that "disregard" means "to ignore, to overlook; to fail to observe." Black's Law Dictionary. Nevertheless, it argues, in essence, that an employer disregards its obligations to employees only when it wilfully or intentionally violates those obligations. Words in a statute are construed affording to commonly approved usage of language. Ganim v. Roberts, 204 Conn. 760,763, 529 A.2d 194 (1987); State v. S R Sanitation Services, Inc., 202 Conn. 300, 308, 521 A.2d 1017 (1987). The common meaning of "disregard" is the meaning set forth above.
If the legislature had wanted to condition debarment on wilful or intentional conduct, it could have done so. See Buonocore v. Branford, supra at 403. The legislature did require a finding that an employer "knowingly or willingly" employed workers at a wage rate less than the customary or prevailing rate before assessing a fine. Connecticut General Statutes 31-53(b). The failure to include a similar requirement in 31-53a makes it clear that the legislature did not condition debarment on knowing or intentional conduct.
Based on the foregoing the Court finds that an employer disregards his obligations to employees within the meaning of31-53a when he ignores, overlooks or fails to observe such obligations. There is sufficient evidence in the record to support a finding that ECI did disregard its obligations to its employees by failing to pay proper overtime, proper amounts to apprentices and by failing to maintain adequate records. CT Page 2179
SELECTIVE PROSECUTION
ECI alleges that the Labor Department selectively enforced the debarment provisions of 31-53a against it and that such selective enforcement constituted a denial of equal protection under the 14th Amendment to the Constitution of the United States.
In order to make out a prima facie case of unlawful selective prosecution, the defendant has the heavy burden of proving: 1) that he has been intentionally singled out and; 2) that the decision to prosecute was based upon an invidious or arbitrary standard such as race, religion or the infringement of a fundamental right. Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501,7 L.Ed.2d 446 (1962); U.S. v. Berrios, 501 F.2d 1207, 1211 (2d Cir. 1974); State v. Haskins, 188 Conn. 432, 474, 450 A.2d 828, cert. denied 479 U.S. 1084 (1982). The mere failure to prosecute other offenders is not unlawful. Oyler v. Boles, 368 U.S. at
The United States Supreme Court in Oyler stated:
 The conscious exercise of some selectively in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification. Therefore, grounds supporting a finding of a denial of equal protection were not alleged.
In support of its claim of selective enforcement ECI argues that 33 other contractors also violated 31-53 and that four of those contractors had violations involving larger sums of money than sums owed by ECI to its employees. A review of the record reveals that those larger amounts were aggregated over substantially longer time periods than was the amount owed by ECI and that none of those amounts included unpaid overtime. There is also no indication in the record that the other violators had failed to keep proper records. Finally, there is no indication that any employee of the other violators had made a formal written complaint such as the one made by Glen Remondi against ECI.
ECI further argues that the Labor Department's impermissible discrimination against it is evidenced by the Department's attempt to ambush ECI. It claims that "[e]ven though the Labor Department was aware of the situation long before the completion of the job, there was no attempt to contact ECI to inform it that its overtime plan raised questions as to its permissibility until after it was completed." (Plaintiff's Brief, p. 2). The foregoing statement is not supported by the record, which indicates the following: CT Page 2180 The violations occurred during the period of March through May, 1987; The Labor Department did not receive the affidavit from Glen Remondi until May 12, 1987; The Labor Department investigation did not commence until June 1, 1987 and ECI was informed of the violations on June 16, 1987. Based on the foregoing, the Labor Department did not fail to inform ECI of ongoing violations.
ECI claims that its selection for debarment proceedings was discriminatory and invidious based on the involvement of the International Brotherhood of Electrical Workers (IBEW). The Deputy Commissioner's findings with respect to the IBEW are summarized below.
In 1985 the IBEW commenced a mandamus action to compel the Labor Department to enforce the debarment provisions of 31-53a
and to compel the Joint Legislative Management Committee to withdraw the awarding of a contract to ECI for the Connecticut Capitol Restoration Project. On April 5, 1985, the mandamus action was concluded by a stipulated judgment in which the Labor Commissioner was ordered to promulgate regulations pursuant to 31-53a and, upon adoption of such regulations, to commence the appropriate actions to produce debarment lists as authorized by 31-53a. The stipulated judgment also required the Joint legislative Management Committee to solicit comments of the Labor Commissioner in determining whether a contract for electrical work was awarded to the "lowest qualified and responsible general bidder" in accordance with 4-137a and 137b of the Connecticut General Statutes. The attorney for the IBEW assisted Glen Remondi in preparing his affidavit concerning ECI's violations of 31-53.
ECI claims that the Labor Department investigator who investigated ECI in this case was "in contact with" Betty Tianti, then head of the Connecticut AFL-CIO, during the investigation. The record indicates that this contact consisted of one telephone conversation on a number of subjects, during the course of which Ms. Tianti was informed that an investigation of ECI had commenced. Ms. Tianti subsequently became the Labor Commissioner. She disqualified herself from hearing this case due to her previous connection with the AFL-CIO. The record does not indicate that Ms. Tianti had any further involvement with this case.
ECI makes much of the Labor Department counsel's request for the right to consult with Ms. Tianti, the Labor Commissioner, before reaching a settlement of this appeal. However, there is no indication that any settlement was reached, that Ms. Tianti approved or rejected a settlement, or even that she was consulted at all concerning a settlement. Moreover, any involvement by Ms. Tianti in this case after the Labor Department's complaint was filed against ECI is irrelevant to ECI's claim of selective prosecution because it occurred after the "prosecution" was CT Page 2181 commenced.
The Deputy Commissioner found that the Labor Department has an obligation to respond in a responsible manner to any constituent, including the IBEW, who seeks to ensure that the law is properly enforced. He further found that the IBEW had no role in the prosecution or disposition of this case. These findings are supported by the record.
ECI's claim that it was singled out for debarment because it was a non-union contractor, was further undercut by its admission at oral argument that most of the 33 other violators, for whom debarment could have been sought, were also non-union contractors.
The factual situation in this case is different from that in State ex rel. Mulhern v. McHenry, 31 Conn. Sup. 172, 176 (1974), where a municipal retirement board involuntarily retired the police chief, Mulhern, notwithstanding that it had never retired anyone in Mulhern's same circumstances. The Court found that the action was based on a wholly improper reason, which was completely unrelated to Mulhern's performance or tenure: The mayor wanted to appoint a new police chief before he left office. There is no evidence that such an improper reason motivated the labor Department in this case. Here there is evidence in the record that the Labor Department chose to proceed against ECI because it considered the facts relating to ECI's violations of31-53 to constitute its "best case" for debarment.
For the reasons set forth above this Court finds that the Labor Department did not violate the standards set forth in4-183(g) of the Connecticut General Statutes and the appeal is therefore ordered dismissed.
AURIGEMMA, J.