ZONING COMMISSION OF THE TOWN OF SHERMAN ET AL.
*v.* THOMAS LESCYNSKI ET AL.
(10069)

PETERS, HEALEY, PARSKEY, SHEA and SPONZO, Js.

Argued October 8—decision released December 28, 1982

*David P. Ball,* with whom, on the brief, was *Steven M. Olivo,* for the appellants (defendants).

*Robert J. Guendelsberger* and *Roland F. Moots, Jr.,* for the appellees (plaintiffs).

*Murray J. Kessler,* for the appellees (intervening plaintiffs).

PETERS, J. This case concerns the permissibility of operating a slaughterhouse in an area of the town of Sherman that is zoned for farming and residential use. The plaintiffs, the zoning commission of the town of Sherman and J. Anthony Crawford, its chairman, brought an action to enjoin the defendants, Thomas Lescynski and Margaret K. Lescynski, from maintaining and operating a slaughterhouse and to compel the defendants to remove equipment kept in the conduct of their slaughtering business. In that action, the Sherman Zoning Preservation Group, an informal association consisting of fifteen property owners in the town of Sherman, successfully moved to intervene as co-plaintiffs. The trial court granted the plaintiffs partial relief in the form of an injunction limiting but not entirely forbidding the defendants' slaughterhouse operation. Only the defendants have appealed.

The memorandum of decision and the undisputed pleadings disclose the following facts. The defendants' slaughterhouse was located on a three-acre farm owned by them since 1965. Under the Sherman zoning regulations, this property lay within a residential and farming area wherein businesses were prohibited.[1]

---

[1] Part I, § 4 of the Sherman zoning regulations provides in relevant part: "In the [farm-residence zones], no building or premises shall be used, and no building shall be erected or structurally altered . . . except for one or more of the following purposes . . .

Prior to 1975, Lescynski engaged in slaughtering to a limited extent. Fully employed elsewhere, he slaughtered animals on his own premises only in the evenings and on weekends, and only provided this service for his family and friends. On April 5, 1975, Lescynski applied to the Sherman zoning commission for permission to raise the roof of a half-enclosed shed on his property from a height of eight feet to sixteen feet. In that application, Lescynski indicated that the shed's function was "housing equipment." As part of the application process, Dr. Anthony Crawford, chairman of the zoning commission, and Dexter Bringle, the commission's zoning enforcement officer, inspected the site of the proposed improvement. They observed a shed, then in disrepair, being used to store farm equipment. Although the inspectors were aware that some slaughtering was done on the premises, they were not then informed, directly or indirectly, that Lescynski planned to use the proposed structure to expand his slaughtering operation. The application was approved. Several days later, on April 10, 1975, Lescynski applied for a building permit to raise the roof on the same structure and to build a block foundation beneath it.[2] Following an inspection by Edward Dolan, the Sherman building inspector, a building permit was issued.

---

(b) Farming, provided that no pig sties and accessory buildings for the housing of poultry or farm animals shall be built within 50 feet of any street or highway. . . . (j) Accessory uses customarily incident to the above but not including a business."

[2] Although the zoning regulations provide that the building inspector and the zoning enforcement officer may be the same person, at the time of Lescynski's applications the zoning enforcement and building inspection authorities were vested in two separate persons. Unless both a zoning permit and a certificate of occupancy were issued, construction and use of new structures were prohibited. Part I, § 9, Sherman Zoning Regulations.

Thereafter Lescynski converted the shed into a slaughterhouse by raising its roof, by expanding its floor area, and by housing it in steel and concrete. He installed coolers, a grinder, cutting tables, slicers, a double sink and other slaughtering equipment. During this construction, Bringle, the zoning enforcement officer, assisted Lescynski with the electrical wiring of an overhead meat hoist.

Between 1975 and 1979, Lescynski greatly expanded his on-premises slaughtering operation until it became his full-time occupation, accounting for almost all of his income. Animals were brought to the farm by their owners, including commercial meat companies,, and then were shot, butchered, dressed, packaged and returned to the owners. Neighbors objected that the expanded slaughtering operation generated traffic, noise and odors, all of which interfered with the quiet enjoyment of their properties and diminished the value thereof.

In April, 1976, a year after the initial approvals, the building inspector again visited the Lescynski property, this time to certify the new structure for occupancy. On the certificate, duly issued on April 30, 1976, the building inspector noted that the structure now contained a freezer and meat handling room. Printed on the certificate was the statement that the building "conforms substantially to the requirements of the Building Ordinances and the Zoning Regulations of the Town of Sherman." The building inspector testified at the trial that he had no authority to certify the structure as conforming to the zoning regulations.

One month later, upon the Lescynskis' application for permission to undertake additional construction on their property, the zoning commission began

investigating whether the slaughtering operation was in violation of the zoning regulations. Meanwhile, in July of 1976, Lescynski's operation was temporarily ordered closed by the town of Sherman until Lescynski installed a 5000 gallon tank for the storage of detritus from the slaughtering. The Sherman first selectman loaned Lescynski a bulldozer for this purpose, and after the installation was complete the slaughtering recommenced. On September 16, 1976, the zoning commission ordered Lescynski to "cease and desist from the slaughtering of animals other than such as may occur as a normal incident of ordinary farming." When Lescynski failed to comply, this litigation ensued.

After a trial to the court, judgment was rendered for the plaintiffs. Although the court refused to require the defendants to remove their slaughtering equipment from the premises, the court restricted the scope of the slaughtering operation to the level at which slaughtering had been carried out before the construction of the slaughterhouse in 1975. In response to a motion for clarification, the court specified days and hours during which the slaughtering operation would be permitted.[3]

The defendants, in their appeal from this judgment, raise three issues. They claim that the trial court erred: (1) in concluding that the defendants' slaughtering operation was not a permitted aspect of farming use under the applicable zoning regulations; (2) in refusing to find that actions of the Sherman town officials constituted such approval

---

[3] The defendants are permitted to engage in slaughtering one night a week and one full day every other weekend between the hours of nine and five; in the alternative, they may conduct such operations every weekend for one half day on either Saturday or Sunday. Permissible weekday night hours are limited to the hours between six and ten.

and ratification of the defendants' slaughtering operation as to estop the town from now restricting it; and (3) in determining that the intervenors, the Sherman Zoning Preservation Group, had standing to seek injunctive relief from the defendants' slaughtering operation. Because we agree with the trial court on the first two of these issues, we need not resolve the third.

The defendants' claim that unrestricted slaughtering is a permitted use in an area zoned for farming is premised on their view that they may rely on the definition of "farming" contained in General Statutes § 1-1 (q).[4] That definition is concededly broader than the common law definition of farming which excludes stock raising and kindred activities, except "when carried on in connection with and incidental and subordinate to tillage of the soil." *Chudnov* v. *Board of Appeals,* 113 Conn. 49, 52, 154 A. 161 (1931). The statutory definition in § 1-1 (q), by contrast, includes "management of livestock" and "packing, packaging, processing . . . any agricultural . . . commodity as an incident to ordinary farming operations. . . ."

---

[4] General Statutes § 1-1 (q) provides as follows:

"(q) Except as otherwise specifically defined, the words 'agriculture' and 'farming' shall include cultivation of the soil, dairying, forestry, raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training and management of livestock, including horses, bees, poultry, fur-bearing animals and wildlife, and the raising or harvesting of oysters, clams, mussels, and, other molluscan shellfish; the operation, management, conservation, improvement or maintenance of a farm and its buildings, tools and equipment, or salvaging timber or cleared land of brush or other debris left by a storm, as an incident to such farming operations; the production or harvesting of maple syrup or maple sugar, or any agricultural commodity, including lumber, as an incident to ordinary farming operations or the harvesting of mushrooms, the hatching of poultry, or the construction, operation or maintenance of ditches, canals, reservoirs or waterways used exclusively for farming purposes; handling, planting, drying, pack-

The trial court did not find it necessary to determine the overall impact of the enactment of § 1-1 (q) on local zoning regulations, and neither do we. In the circumstances of the present litigation, even if we accept arguendo the defendants' contention that the statutory definition rather than the common law definition of farming is applicable, the defendants cannot prevail. The statutory definition, although it includes "management of livestock," does not expressly countenance slaughtering of livestock on a commercial basis; it is noteworthy that § 1-1 (q) specifically encompasses "shearing" and "training" of livestock, but does not mention "slaughtering." Furthermore, § 1-1 (q) itself limits "packing, packaging, processing" to activities "incident to ordinary farming operations." Nothing in this statutory language nor in its legislative history persuades us that the legislature meant to include within the definition of farming the regular, commercially organized slaughtering of livestock having no relationship to the farm itself.

Even if their slaughterhouse was not, as a matter of law, a permitted use of their Sherman property, the defendants argue in the alternative that the

ing, packaging, processing, freezing, grading, storing or delivering to storage or to market, or to a carrier for transportation to market, or for direct sale agricultural or horticultural commodity as an incident to ordinary farming operations, or, in the case of fruits and vegetables, as an incident to the preparation of such fruits or vegetables for market or for direct sale. The term 'farm' includes farm buildings, and accessory buildings thereto, nurseries, orchards, ranges, greenhouses or other structures used primarily for the raising and, as an incident to ordinary farming operations, the sale of agricultural or horticultural commodities. The term 'aquaculture' means the farming of the waters of the state and tidal wetlands and the production of protein food, including oysters, clams, mussels and other molluscan shellfish, on leased, franchised and public underwater farm lands. Nothing herein shall restrict the power of a local zoning authority under chapter 124."

town of Sherman is estopped from applying its zoning regulations to them. In considering this claim, the trial court concluded that the defendants had failed to sustain their burden of proving either wrongful inducement by the town or justifiable reliance by the defendants.

The defendants nowhere take issue with the legal principles concerning municipal estoppel which the trial court found to be applicable. Under our well-established law, any claim of estoppel is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury. *Bozzi* v. *Bozzi,* 177 Conn. 232, 242, 413 A.2d 834 (1979); *Dupuis* v. *Submarine Base Credit Union, Inc.,* 170 Conn. 344, 353, 365 A.2d 1093 (1976); *Pet Car Products, Inc.* v. *Barnett,* 150 Conn. 42, 53–54, 184 A.2d 797 (1962). Although estoppel may not generally be invoked against a public agency in the exercise of its governmental functions; *Dupuis* v. *Submarine Base Credit Union, Inc.,* supra, 353; *Bianco* v. *Darien,* 157 Conn. 548, 556, 254 A.2d 898 (1969); *State* v. *Stonybrook, Inc.,* 149 Conn. 492, 501, 181 A.2d 601, cert. denied, 371 U.S. 185, 83 S. Ct. 265, 9 L. Ed. 2d 227 (1962); 6 McQuillin, Municipal Corporations (3d Ed. Rev.) § 20.13; 8A McQuillin, supra, §§ 25.349, 25.358; an exception is made where the party claiming estoppel would be subjected to a substantial loss if the municipality were permitted to negate the acts of its agents. *Dupuis* v. *Submarine Base Credit Union, Inc.,* supra, 354; see 6 McQuillin, supra; 9 McQuillin, supra, § 27.56. Estoppel against munici-

palities is therefore limited and may be invoked against the enforcement of zoning regulations (1) only with great caution, (2) only when the resulting violation has been unjustifiably induced by an agent having authority in such matters, and (3) only when special circumstances make it highly inequitable or oppressive to enforce the regulations. *Dupuis* v. *Submarine Base Credit Union, Inc.,* supra, 354.

The defendants' claim of estoppel is based on the preliminary permits secured by them before the expansion of their slaughtering operation, the assistance given them by town officials in making alterations incident thereto, and the acts of the town which acknowledged the expansion once it was under way. We will consider these in turn.

The claim that the 1975 building permit and zoning approval constituted an approval of the expanded slaughtering operation is not supported by any evidence that the town, in granting the approvals, was then aware that the defendants planned such a use for the proposed structure. The town agents cannot be said to have ratified a use of which they were ignorant; see 10 McQuillin, supra, § 29.107;[5] especially since it is the defendants' burden to show that in undertaking the expansion the defendants had exercised due diligence in

---

[5] 10 McQuillin, Municipal Corporations (3d Ed. Rev.) § 29.107 reads: "Knowledge as a condition precedent. Ratification and estoppel are based upon knowledge and intention, and in order to constitute a ratification, it is necessary that the [municipal] officers ratifying be fully advised of all the facts connected with the act claimed to be ratified." See *Cleveland* v. *Cleveland Electric Illuminating Co.,* 440 F. Sup. 193, 204 (N.D. Ohio 1977), aff'd mem., 573 F.2d 1310 (6th Cir. 1977), cert. denied, 435 U.S. 996, 98 S. Ct. 1648, 56 L. Ed. 2d 85 (1978); *Lancaster* v. *Columbus,* 333 F. Sup. 1012, 1023 (N.D. Miss. 1971).

ascertaining its legality. *Dupuis* v. *Submarine Base Credit Union, Inc.*, supra, 353; see *Linahan* v. *Linahan,* 131 Conn. 307, 327, 39 A.2d 895 (1944). A proposed improvement's structural compliance with local zoning and building ordinances does not preclude local regulation of the use to which the improvement is subsequently put.

We are equally unpersuaded by the defendants' claim that the assistance provided them by the zoning enforcement officer and selectman created an estoppel. It has consistently been the law of this state that a municipality cannot be estopped by the unauthorized acts of its officers or agents. *United States* v. *Windsor,* 496 F. Sup. 581, 593 (D. Conn. 1980); *Dupuis* v. *Submarine Base Credit Union, Inc.,* supra, 352; *Carini* v. *Zoning Board of Appeals,* 164 Conn. 169, 174, 319 A.2d 390 (1972), cert. denied, 414 U.S. 831, 94 S. Ct. 64, 38 L. Ed. 2d 66 (1973); *Hebb* v. *Zoning Board of Appeals,* 150 Conn. 539, 542, 192 A.2d 206 (1963); see 3 McQuillin, supra, § 12.126a; 9 McQuillin, supra, § 27.56; 3 Rathkopf, Law of Zoning and Planning (4th Ed.) § 45.05 [3] [a]. The defendants have not shown how the loan of a bulldozer by a town selectman or the provision of electrical assistance by a town zoning officer could constitute official acts by town authorities. A fortiori, any personal approval of the slaughtering operation implicit in these actions cannot be deemed to have been officially authorized by the municipality.

The defendants' final and most troublesome claim of estoppel is grounded on events that transpired in the spring and summer of 1976, after the defendants had, as the trial court found, begun expansion of their slaughtering operations. The

town's certificate of occupancy was issued by the building inspector on April 30, 1976, at a time when the building had been completed and visibly contained a meat packing or meat handling room, a freezer and meat processing equipment. The certificate of occupancy certified that the defendants' building "conforms substantially to the requirements of the Building Ordinances and the Zoning Regulations of the Town of Sherman" and approved the building for occupancy as a "Freezer & Meat Handling Room, Changed from Present Building." Two months later, in July, the town required the defendants to install a 5000 gallon holding tank for the containment of waste products associated with the slaughtering operation. Only after the issuance of the certificate of occupancy and the installation of the holding tank did the town's zoning commission, in September, 1976, order the defendants to cease and desist from continuing their slaughterhouse operation. The trial court nonetheless found no estoppel, for two independent reasons: the building inspector lacked authority to certify compliance with zoning regulations, and the town's actions were "not inconsistent with the position that a limited slaughtering operation was permissible."

The trial court's second reason is dispositive of this claim of error. In essence, the trial court found, on the basis of all of the credible factual evidence presented at the trial, that the defendants had failed to prove that the town had induced anything other than greater efficiency in the pre-1975 slaughtering operation or that the defendants had justifiably and reasonably relied upon the town's actions in determining to expand their pre-1975 operating patterns. Implicit in this finding

was the inability accurately to pinpoint the rate of growth of the defendants' operation, a problem accentuated, as the plaintiffs point out, by the defendants' failure to produce relevant business records at the trial. In addition, the lapse of time between the issuance of the certificate of occupancy and the issuance of the cease and desist order, a period of less than five months, might reasonably, in the eyes of the trier of fact, have appeared too short a period on which to premise substantial expansion of the defendants' activities in justifiable reliance on the town's conduct.

It is noteworthy that the cases on which the defendants rely to establish their defense of estoppel are cases in which town officials acted to issue approvals when they were fully aware of the intended use to which a property or structure was to be put.[6] See *District of Columbia* v. *Cahill*, 54 F.2d 453 (D.C. Cir. 1931); *Gillotti* v. *Food Fair Stores of Conn., Inc.*, 148 Conn. 412, 417–18, 171 A.2d 415 (1961); *Tankersley Bros. Industries, Inc.* v. *Fayetteville*, 227 Ark. 130, 131, 296 S.W.2d 412 (1956); *Crow* v. *Board of Adjustment*, 227 Iowa 324, 326, 288 N.W. 145 (1939); *Little Falls* v. *Fisk*, 24 N.Y.S.2d 460, 464 (S. Ct. 1941); *Willis* v. *Woodruff*, 200 S.C. 266, 268–69, 20 S.E.2d 699 (1942). Because in the present proceedings the trial court

---

[6] The only other case cited by the defendant held that an estoppel was created even in the absence of a permit, where the municipality had required improvements consistent with the use in controversy. *Evanston* v. *Robbins*, 117 Ill. App. 2d 278, 254 N.E.2d 536 (1969). In so holding, the Illinois court relied on its finding that the municipality's acts had "induced detriment" and also on the absence of any testimony that the use had tended to deteriorate the neighborhood. *Id.*, 285. The present case is distinguishable because the trial court made no finding of detriment and there was testimony that the neighboring property had been adversely affected.

736

found to the contrary, these cases are all distinguishable and the trial court's finding that there was no estoppel must stand.

Since the trial court did not err in granting the relief requested by the plaintiff zoning commission, it is unnecessary to consider the defendants' final claim of error. Regardless of whether the intervening plaintiffs had standing in this action, the present injunction was properly ordered by the trial court.

There is no error.

In this opinion the other judges concurred.