[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I.
Introduction
 A.
The plaintiff William Dornfried, the Zoning Enforcement Officer of the Town of Plainville, has filed this case seeking injunctive relief against the defendants October Twenty-Four, Inc. and A. Aiudi and Sons from removing rock and gravel from October Twenty-Four, Inc.'s 38 acre parcel on Loon Lake Road in Plainville, Connecticut.[1] On August 25, 1992, CT Page 5854 the court, Goldberg, J., granted a temporary injunction finding that the activities constituted quarrying in a residential zone in violation of the zoning regulations.
On or about November 24, 1992, the plaintiff filed a Motion for Contempt alleging that the defendants had continued to quarry in violation of Judge Goldberg's order. A hearing was held before Langenbach, J. on January 5, 1993, when the defendants indicated that they would cease all excavation activities.
 B.
Factual Background
At trial, Mark Devoe, the Plainville Director of Planning and Community Development reviewed a number of maps and minutes covering the history of activities on this parcel. In order to understand the present situation, it is necessary to review those minutes.
We start with the January 10, 1978 meeting when Attorney Theodore Poulos, representing the defendant October Twenty-Four, Inc., reviewed a proposed site grading plan (Exhibit J), presumably pursuant to Article Six of the site plan requirements, to "change the contours of the land." The minutes clearly reflected that the present zoning was R-40, and that "[w]hat they would be taking out is rock." The proposal was to take five years. One Commissioner, Mr. Pegelo, stated "that this would be a quarry operation." The Commission agreed that it would be deemed grading because there would be no crusher or mechanical equipment to crush rock (which is only allowed in a Quarry Zone), and the applicants would only be allowed to remove the material. The site grading plan was filed because it was the "only regulation . . . that would cover this type of request." Blasting would be regulated by the state. The former Town Planner, Mr. Schaefer, requested a staged operation; that is, to finish one area before going into another. In responding to a suggestion by Commissioner Santacroce to change the zone to quarry for five years, Mr. Schaefer responded that the Commission could not change a zone for a period of time, that a change would result in a crusher being utilized, and that there would be little control. Mr. Aiudi estimated that 300,000 to 400,000 yards of rock would be removed and agreed to a request by Mr. Schaefer to limit the CT Page 5855 area of excavation. The following motion was made:
 Motion made by Mr. Santacroce that the Planning Zoning Commission approve a site grading plan for Loon Lake Road located in Plainville, Connecticut. Scale one inch equals one hundred feet. Dated November 1977. Empire Associates Inc., Plainville, Connecticut, with the stipulation that the grading will be from the southerly portion of the lot to the Connecticut Coordinate Line N307500 and no further. Subject to yearly review. Seconded by Mr. Castonguay.
The Commissioners debated the motion and voted to approve the motion with only Mr. Pegelo objecting.
The site grading plan, as explained by Mr. DeVoe, shows the limits of the operation at contour 360, as well as the southerly line at N307500. The plan is silent on amount of rock to be removed, depth of excavation, specific area of excavation, etc. (Exhibit J).
The next set of minutes is January 22, 1980. (Exhibit 9a). Mr. Schaefer stated, in connection with the review of the site grading plan, "[i]t's not an approval. It's another situation similar to the review that you did to Tilcon Tomasso." He noted that "[a]nd at the time the approval requested that the excavation not exceed the limits of line N307500 and as you can see, that is before coming back to the Commission. This amount of material has been excavated at the present time and, of course, the proposal is to do the entire site essentially." He further noted "[i]t's mostly stone. They're taking the stone out of there." Commissioner Caparelli commented "[y]ou mean it's like a quarry operation?" Mr. Pugliese (of Auidi) remarked, "No, it's a site grading operation." Mr. Schaefer added, "if they're doing any crushing or any manufacturing of material in there, it would be a quarry. For all practical purposes they're into almost entirely stone. . ." Mr. Pugliese and Mr. Schaefer further stated, in response to a question concerning the Commission's action on the issue that:
 Mr. Pugliese: "No, it's just an update on what we're doing out there."
CT Page 5856
 Mr. Schaefer: "At the time of approval, you wanted to have a yearly look at it and see what they were doing, so that they were not exceeding the area that they were granted approval to regrade. You did a similar regrading plan only it was into sand rather than into the stone material over on Johnson Avenue and Northwest Drive on Tomasso's property. There again it was not an excavation to create a hole but a regrading of an existing site. But they will be having a hopefully a developable piece of property here at the conclusion." (sic).
In further discussion, Mr. Schaefer indicated the zone was R-40 and the Commissioners noted that they would like an annual review. No votes were taken.
The next review date was March 24, 1981. (Exhibit 9b). Mr. Engels, on behalf of Aiudi, reviewed the progress of the excavation showing the amount of material removed from November 1977 to January 1980 and then to March 20, 1981. He noted approximately 25,000 tons had been removed in the last 12-14 months. In response to a question concerning the replacement of soils, he indicated that the reclamation process had not started. Mr. Aiudi believed it would start the next year. In response to a question from Commissioner Murphy as to whether a motion was needed, Mr. Schaefer stated, "[n]o, when the Commission approved the grading plan, they requested that they be kept abreast of the progress." He also commented that the Commission had requested they stay within the grid line . . . 307500 and that they are staying with that area. Commissioner Caparelli, in responding to the Aiudi proposal to give an annual report stated, "it's just an update like Tomasso's." No vote was taken.
March 9, 1982 is the next review. (Exhibit 9c). Mr. Engels again reviewed the progress indicating that about 21,000 cubic yards had been removed since the last review, that the progress had been steady, toward the west. Commissioner Stewart asked what was being removed and Mr. Engels indicated "stone". No vote was taken.
The next review was on November 8, 1983. (Exhibit 9d). Mr. Schaefer noted that a portion had been regraded and requested that the Commission schedule a field trip to the site. He expressed his desire for more "regrading and seeding CT Page 5857 as this thing progresses to the north so that we don't have large areas of straight quarry face which you got straight rock drops in there, 18-20 feet some of the areas." (sic).
On November 22, 1983, the Commission again discussed the grading plan. (Exhibit 9e). Mr. Engels stated that two to three hundred feet of soil had been replaced. Mr. Aiudi indicated that the excavation was going in a northerly direction and Commissioner Reinwald noted "that's all been approved." A discussion ensued about when the excavated area would be filled and Mr. Schaefer verbalized the Commission's desire to finish one area before excavating another. In response to a statement by Mr. Schaefer concerning blasting, Mr. Caparelli remarked that he thought [Aiudi] was "digging for sand." Commissioner Reinwald stated it was traprock. Mr. Santocroce commented on the size of the quarry face, that he was "amazed at how deep that . . . quarry was going. . . ." After further discussing the direction of the excavation and another site, Mr. Schaefer stated, "[t]he difference is that that is a quarry operation, and this is only a grading. Eventually, this will be at a level that's compatible with the properties surrounding it; which is probably not the case with a quarry, and that's the difference with a quarry operation." (sic). Mr. Caparrelli added, "[t]hat's for sure." No vote was taken by the Commission.
The minutes submitted at trial reflect a six year gap as the next date is January 10, 1989. (Exhibit 9f). It does appear from the site grading plan that a revision was prepared on June 16, 1987, (Exhibit L) but there was no evidence that the Commission discussed it at that time. In January 1989, the Commissioners viewed a video tape of the site taken December 22, 1988. Utilizing a color coded version of the site plan, Mr. Engels reviewed the progress of the excavation noting that of the 14-15 acres to be regraded, approximately 7 acres had been excavated.[2] He indicated that they had not reached the proposed northerly boundaries and that the elevation of the finished areas ranged from 360 to 352.1 feet. Mr. Schaefer remarked that "it appears that there has been more material taken out than I had anticipated when I look at the original proposal. The original time table for operation, an estimate was given at approximately 5 years time frame. Obviously, we are considerably beyond that period at this point." (sic). He noted that Aiudi may have gone down 30 feet or more. Acting Chairman Toner stated that "in any CT Page 5858 quarry operation they'd go until they hit brownstone." In responding to a question from Commissioner Caparrelli, Mr. Aiudi indicated it might take ten years to finish. Commissioner Castonguay remarked, in response to Commissioner Caparrelli's statement, "that the depth was not as important as the finished grade that if the depth was 30 feet deeper than the site grading plan it more or less becomes a quarry." Commissioners Toner and Caparrelli then added that their concern was the finished grade more than the extra rock removed. The Commission tabled any action that evening as Commissioner Toner requested Mr. Schaefer to provide the 1978 minutes.
The Commission met again on May 23, 1989 (Exhibit 9g), at which time they denied a request from Tomasso Bros. Inc. to intervene in said proceedings pursuant to General Statutes 22a-19.[3] The Commission then voted, without discussion, to allow the defendant "to continue its site grading plan in accordance with the guidelines as originally given and that finished grade be strictly adhered to."
The next meeting took place on April 24, 1990. (Exhibit 9h). Mr. Aiudi reported the past year's excavation to the Commission, noting that 7 1/2 acres had been reclaimed, and that the dirt was 25 feet deep in some areas.[4] He also commented on the pump at the bottom of the excavation (an elevation of 315.2 feet). He indicated that the excavation limits would be along Old Loon Lake Road, beyond the tree line. The Commission then voted to accept the map report.
The final set of minutes is September 24, 1991. (Exhibit 9i). Mr. Aiudi reviewed the progress on the April 23, 1991 site plan. (Exhibit L). Commissioner Stewart asked whether this review was for informational purposes and Chairman Santacroce indicated "this is for information and will be back next year again showing us what transpired in the last year." (sic). Commissioner Stewart later asked whether a vote was required and Chairman Santacroce stated "no, just a review." After a discussion about future development, the review ended.
 C.
This case is part of a continuing saga which has neither begun nor will end with this decision. The defendants own land which abuts that of Tomasso Brothers, Inc. (hereinafter, CT Page 5859 "Tomasso") in Plainville and New Britain near the confluence of Routes 84 and 72. Tomasso and its related corporations or business entities are involved in similar commercial operations. Tomasso has also sought to develop its abutting piece into an office park. In Tomasso Bros. Inc. v. October Twenty-four, Inc., CV 89-700294, Judge O'Neill entered a permanent injunction on December 21, 1990 ordering the defendants to
 cease all quarrying activity including but not limited to all blasting and rock removal from Corporation's property within ten (10) days after the plaintiff's plan of development for a technology park development is approved by the appropriate authority or authorities of the Town of Plainville. This order is not applicable to any development plan approved for only industrial or light industrial development. This order shall not be stayed from the date of such municipal approval for any reason including any possible appeals from such municipal authorization, whether successful or not.
Judge O'Neill entered this injunction, finding, inter alia, that the defendant October Twenty Four, Inc. has, since at least 1978, owned the 38 acre parcel and has engaged in rock excavation for some 12 years. He deemed the operation to be quarrying. He noted that Tomasso purchased its property in August, 1988 and that the Tomasso property is in a Technology Park Zone and the October Twenty-Four, Inc. property is in a R-40 residential zone. Judge O'Neill ruled that the quarrying operation constituted a nuisance and is not allowed under the Plainville zoning regulations.
The decision was appealed to the Supreme Court and on February 18, 1992, the Supreme Court, after learning of a modification to the Tomasso site plan by the deletion of a hotel, set aside the trial court decision and remanded for further proceedings. Tomasso Bros., Inc. v. October Twenty-Four, Inc., 221 Conn. 194 (1992).
After additional hearings, on August 7, 1992, Judge O'Neill confirmed his prior findings concluding that "the noise generated by the defendants' operation of the quarry is a nuisance to plaintiff and is unreasonable." He ordered the defendants "to cease all quarrying activities including but CT Page 5860 not limited to blasting and rock removal . . . within ten (10) days after plaintiff's plan of development for a technology park development is approved by the appropriate authority of the Town of Plainville."
Tomasso had obtained land use permits from the Town of Plainville and New Britain. The defendants herein have appealed those local administrative actions. Thus, now pending (or recently pending) in this court are the following actions:
 (1) October Twenty-Four, Inc. v. Plainville Inland Wetlands and Watercourses Commission, CV 92-0449112S (appeal of inland wetlands approval for Tomasso Bros., Inc.).
 (2) October Twenty-Four, Inc. v. Plainville Inland Wetlands and Watercourses Commission, CV 92-0449259S (appeal of inland wetlands approval for Tomasso Bros., Inc.).
 (3) October Twenty-Four, Inc. v. New Britain Zoning Board of Appeals, CV 92-0450438S (appeal of ruling of New Britain building inspector's determination that a 40 unit lodge/multi use office building is a permissible accessory use).
 (4) October Twenty-Four, Inc. v. Plainville Planning and Zoning Commission, CV 920451414S (appeal of site plan approval for Tomasso Bros., Inc. appeal dismissed, Berger, J., April 29, 1993).
There are other cases as well. After the Supreme Court issued its decision, the zoning enforcement officer issued cease and desist orders, dated April 29, 1992, and May 7, 1992, to the defendant October Twenty-Four, Inc. Those decisions were appealed to the Zoning Board of Appeals which sustained Mr. Dornfried's actions. That decision was appealed to this court in (5) October Twenty-Four, Inc. v. Plainville Zoning Board of Appeals, CV 92-0453514S. While that appeal was pending, the defendant October Twenty-Four, Inc. filed zone change applications with the Commission to render the cease and desist orders moot. (Exhibits 5; 6). Tomasso attempted to enjoin the zone change applications in (6) Tomasso Bros., Inc. v. October Twenty-Four, Inc., CV 92-0452695S. This court denied the relief sought in that matter and the defendant proceeded CT Page 5861 with its zone change requests. On or about September 8, 1992, the easterly half of the subject property was rezoned TP (Technology Park). The request to change the westerly half to a quarry industrial zone was denied on September 8, 1992. An appeal of that decision is now pending in (7) October Twenty-Four, Inc. v. Plainville Planning and Zoning Commission, CV 92-0453743S.
On November 24, 1992, the Commission denied the defendant's request for a change of zone for said westerly half of the property from R-40 to RI (Restricted Industrial). An appeal was taken in (8) October Twenty-Four, Inc. v. Plainville Planning and Zoning Commission, CV 92-0454564S.
 II.
Discussion
 A.
The defendants first argue that the plaintiff has failed to meet his burden of proof. In addition, the defendants have filed two special defenses to this action: (1) the action is barred by the doctrine of estoppel and (2) the action is barred by the doctrine of laches.
1.
The present action is brought pursuant to General Statutes 8-12 which allows the zoning enforcement entity (in this case, the plaintiff), to institute an action to prevent, restrain, correct, etc. an unlawful act. See, for example, Fisette v. DiPietro, 28 Conn. App. 379, 386-388 (1992); Johnson v. Murzyn, 1 Conn. App. 176, cert. den. 192 Conn. 802
(1984). As stated recently in Gelinas v. West Hartford,225 Conn. 575, 588 (1993),
 [I]n seeking an injunction pursuant to 8-12, the town is relieved of the normal burden of proving irreparable harm and the lack of an adequate remedy at law because 8-12 by implication assumes that no adequate alternative remedy exists and that the injury was irreparable. Conservation Commission v. Price, 193 Conn. 414, 429, 479 A.2d 187 (1984). The town need prove only that the statutes or ordinances were CT Page 5862 violated. Id. The proof of violations does not, however, deprive the court of discretion and does not obligate the court mechanically to grant the requested injunction for every violation. Id., 430.
The defendants argue that the plaintiff has not met his burden in proving, as framed by the pleadings, that the defendants have conducted an unpermitted act.
The focus is on paragraph five which states:
 On January 10, 1978, the Planning and Zoning Commission approved a `Site Grading Plan' for the Defendant subject to a yearly review up through and including September 24, 1991, nevertheless, the Defendant exceeded its permission and started to quarry on its property and is continuing its quarrying operation as of this date.
Paragraph six states that the act of quarrying has been found by
 (a) The decision in the file of Tomasso Brothers, Inc. v. October Twenty-Four, Inc., Docket Number CV 89-0700294S decided by N. O'Neill, J.
 (b) A decision of the Supreme Court in Tomasso Brothers, Inc. v. October Twenty-Four, Inc. decided in Volume 221 Conn. 194 (1992);
 (c) The defendant's principal officer Elmo R. Aiudi; sworn testimony as recorded on pages 36-38 March 3, 1992, before the Honorable Norris L. O'Neill, in the continuing case of Tomasso Brothers, Inc. v. October Twenty-Four, Inc.; and
 (d) By actual observation of the quarrying activities by the Plaintiff.
The plaintiff argued at trial that this court should ignore paragraph five and view this complaint not in terms of exceeding permission but rather simply as a case in which an unauthorized activity (quarrying) was being conducted in a zone in which it is not permitted. CT Page 5863
2.
The proposition that the pleadings frame the issues before a trial court is well established in our caselaw. Doublewal v. Toffolon, 195 Conn. 384, 390 (1985) citing 1 Stephenson, Conn. Civ. Proc. (2d. Ed. 1970) 75. "The purpose of the complaint is to limit the issues to be decided at the trial of a case and is calculated to present surprise." Farrell v. St. Vincent's Hospital, 203 Conn. 554, 557 (1987). There was, of course, no specific request to amend the complaint to conform to the proof. Practice Book 178. This court cannot, therefore, disregard the manner in which the plaintiff drafted his complaint. The plaintiff had the burden of proving that the defendants exceeded the scope of their permission after September 24, 1991 by starting and continuing to quarry.
3.
 a.
In order to prove that they exceeded the scope of their permission, the plaintiff needed to define the limits of the permission. As previously noted, the site grading plan approval (Exhibits J; K) was very broad. The Commission set no limits other than a southerly limitation at Connecticut Coordinate Line N307500. Additionally, the Commission indicated it was "subject to yearly review." The minutes indicate that the Commissioners knew it was an R-40 zone, that rock would be removed, that it could perhaps be considered a quarry operation, that twenty acres would be utilized, that blasting would occur, that approximately 300,000 to 400,000 yards of rock would be removed, that there would be regrading and that the Town Planner wanted it to be a staged operation, i.e., regrade one area before moving into the next. With all this knowledge, no limitations were set other than the southerly boundary. Mr. DeVoe noted in his testimony that the "scope of the work in the original approval seemed to shift continually." (Transcript, p. 15). He did note that the final grade was to be at the 360 foot elevation. (Transcript, p. 18). A review of the actual plan shows no stated limitation and the southerly boundary has never been an issue.
b. CT Page 5864
The second so-called condition was the annual review. Judge Goldberg issued his injunction based on his conclusion that "the defendant was aware that its `site grading' plan was approved subject to an annual review and accordingly, was subject to termination annually." This court, after reviewing the testimony and the exhibits, including the minutes of each meeting, does not agree. As noted, the initial approval did state "subject to yearly review." (Exhibit K). Presumably this annual review language came from the requirement of the quarry industrial zone (zoning regulations — Exhibit A, 555). The annual review is not part of the site plan regulation (Exhibit A, 600) or the removal of top soil, sand and gravel (Exhibit A, 900).
The minutes indicate, over and over again, that the review condition was limited to a progress report. It was not a condition requiring yearly permission to continue. No vote was taken at the January 22, 1980 meeting ("it's not an approval; it's just an update on what we are doing out there") (Exhibit 9a); the March 24, 1981 meeting ("No, when the Commission approved the grading plan, they requested that they be kept abreast of the progress") (Exhibit 9b); March 9, 1982 meeting (Exhibit 9c) or November 22, 1983 meeting (Exhibit 9e). There was then, according to the exhibits and testimony, no review until January 10, 1989, a six year gap.[5] The Commission requested the Town Planner review the minutes and on May 23, 1989 it met again. At that meeting it did vote, without discussion, to allow the defendant "to continue its site grading plan in accordance with the guidelines as originally given and that finished grade be strictly adhered to." (Exhibit 9g). On April 24, 1990, the Commission voted to accept the report. (Exhibit 9h). Finally, at the September 24, 1991 meeting, the Commission did not vote. Indeed, in response to a question whether the review required a vote, the Chairman stated "[n]o, just a review." Mr. DeVoe added, "it did not have a vote last year." (Exhibit 9i).
This court concludes that the May 23, 1989 vote was certainly not the normal action of the Commission. Its practice of not voting — indeed of rejecting the concept or the ability to vote — was the rule. The plaintiff has not met his burden to show that the annual review constituted a permitting practice making this a year to year permit. The evidence clearly indicates the opposite. CT Page 5865 c.
Mr. DeVoe testified that the original approval contained no limit as to the depth of excavation (Transcript, p. 51), although he believed the defendants were only going down five to ten feet. He, of course, was not employed by the Town at the time of the original approval. The minutes clearly reflect that the Commission knew the excavation was well below five or ten feet. On November 8, 1983, the Town Planner commented on rock faces 18-20 feet. (Exhibit 9e). Later that month, the Commissioners, after a field trip, were "amazed at how deep that . . . quarry was going. . . ." (Exhibit 9e). After the six year gap in annual reviews, the Commission met again in 1989 and the Town Planner noted that "Aiudi may have gone down thirty feet or more." (Exhibit 9f). The Commissioners reviewed a videotape of the site in January 1989.
Mr. Dornfried testified that he was present at all the Commission meetings, including the January 10, 1978 meeting. (Transcript, p. 110). He viewed the site four to five times per year from the beginning and starting in 1989, several times per week. (Transcript, p. 194). He never voiced any objection to the defendants' activities during the period 1978 to 1991. (Transcript, pp. 118-119). His testimony was that he did not recall whether he examined the January 1978 minutes prior to issuing his cease and desist orders in April, 1992. (Transcript, p. 111). He did not recall what transpired at the other meetings. (Transcript, pp. 166-176). He indicated that the phrase "exceeded permission" meant the permission from the Commission from January 10, 1978 to September 24, 1991. (Transcript, p. 116).
Mr. Dornfried stated that he issued the cease and desist orders based on several factors, including Judge O'Neill's decision, complaints and a visual inspection. (Transcript, pp. 130; 154). He did not remember whether any specific act triggered the enforcement action. (Transcript, p. 130). He indicated that the activities he observed, one week before the first cease and desist order was issued, were "much larger and much deeper." While he was unable to quantify the size or compare it to other years, he believed the "removal was going faster than the filling." (Transcript, pp. 131; 178; 188). Yet on further questioning, he was unable to say whether the area was larger in 1992 than a prior year. (Transcript, pp. 132; 133). No measurements were taken. CT Page 5866 (Transcript, pp. 178; 235). He did not remember exactly what portions of Judge O'Neill's opinion or the Supreme Court ruling triggered his decision to commence enforcement action. (Transcript, pp. 154; 159). Indeed, he did not understand Judge O'Neill's decision. (Transcript, pp. 226; 235). Mr. Dornfried further testified that he never really examined the review plans and further, that he did not understand "grades". (Transcript, pp. 176; 234). He stated that he did not know if depths were shown on the review maps. (Transcript, p. 177). He testified that he did not use any objective criteria to determine that the site was a quarry. (Transcript, p. 188).
Mr. Dornfried indicated that he thought the site grading approval allowed the defendants to "remove and fill." (Transcript, p. 235). He did not know what the elevation was of the land that had been reclaimed, and he had not taken any measurements. He was never sure what the Commission meant by its approval and, indeed, had never asked the members. (Transcript, p. 235). He indicated that the basis for his belief that the defendants had exceeded their permission was the fact that the hole was not being filled fast enough. (Transcript, pp. 237-239). He noted there was no document or standard which governed the size of the hole. (Transcript, pp. 240-242).
Mr. Dornfried indicated that two weeks prior to issuing the April 29, 1992 cease and desist order he received a copy of a letter from Attorney Michalik to Attorney Segal.[6]
(Exhibit 10). Item one of the letter concerned this property and Judge O'Neill's decision. Mr. Michalik stated that "the concern which the officials of the town wish to have addressed is the potential liability for the town in failing to take any affirmative action to curtail the nuisance or to curtail activities which violate zoning regulations." Mr. Dornfried did not know who the "town officials" were that Mr. Michalik mentioned. (Transcript, p. 139).
Mr. Dornfried also testified that he received other letters. Mr. Robert Mastrianni wrote on February 29, 1992 to Mr. Dornfried enclosing a copy of the Supreme Court decision and requesting that the zoning regulations be enforced. (Exhibit H1). Mrs. Buttemeyer wrote to the Town Council on March 2, 1992, questioning why the town had not closed the quarry. (Exhibit H2). Attorney James Throwe, counsel for Tomasso Brothers, Inc., wrote to Mr. Dornfried on April 3, 1992, advising of the Supreme Court's decision and questioning what CT Page 5867 zoning enforcement action was contemplated. (Exhibit H3). (Transcript pp. 142-143).
It was also noted that he received two letters in 1988 from individuals complaining about the defendants' activities. (Transcript, pp. 214-219; Exhibits 12, 13).
The defendants have raised the issue as to why Mr. Dornfried took action in April 1992, (and why this suit was brought in June 1992) when he knew of Judge O'Neill's decision in January, 1991. Attorney Throwe forwarded a copy of Judge O'Neill's decision to him in January, 1991. (Transcript, pp. 147-148; Exhibit 11). Mr. Dornfried did not recall when he first read the decision (Transcript, p. 149), nor if he ever discussed the matter with the town attorney prior to his recent discussions with Mr. Segal. (Transcript, p. 150). He never discussed it with the Commission in 1991. (Transcript, p. 150). The court also heard testimony that a copy of Mr. Aiudi's transcript before Judge O'Neill "appeared on his desk." (Transcript, pp. 152; 160).
This court concludes from all the above, that (a) the Commission's initial approval was open ended — concerned only with final grade, the southerly limitation and yearly reports, and (b) the plaintiff failed to prove that the defendants' activities after September 24, 1991 were anything other than consistent with the initial approval. In other words, the plaintiff has not proved that the defendants exceeded their original 1978 permission. See Fisette v. DiPietro, supra, 386.
 B.
Intertwined with the above issue is the defendants' position that this case is barred under the equitable doctrines of estoppel and laches. It is, therefore, appropriate that these issues be discussed.
1.
The second special defense, laches, is easily resolved and will be addressed first. Simply put, a "zoning commission is not estopped by laches from enforcing its zoning laws." West Hartford v. Rechel, 190 Conn. 114, 120 (1983) (hereinafter, "Rechel"), citing Bianco v. Darien, 157 Conn. 548, CT Page 5868 556 (1969).
2.
The estoppel issue is a different matter. We start with the premise that "a municipality can be estopped by erroneous acts of its officers from enforcing its zoning ordinances as long as those officers act within the scope of their authority." Rechel, supra, 121. As noted in Rechel, supra,
 In municipal zoning cases, however, estoppel may be invoked "(1) only with great caution, (2) only when the resulting violation has been unjustifiably induced by an agent having authority in such matters, and (3) only when special circumstances make it highly inequitable or oppressive to enforce the regulations." Dupuis v. Submarine Base Credit Union, Inc., 170 Conn. 344, 354 (1976).
First, as noted above, the officers must act within the scope of their authority. Rechel, supra, 121. In that case, the building inspector (who was also the zoning enforcement officer) had issued rooming house licenses even though rooming houses as main uses had been totally forbidden in West Hartford for a long period of time. Id., 116, 119-20. The Rechel court held that the building inspector was:
 the proper person to issue such licenses and the proper person to certify that the rooming house was or would be in compliance with existing zoning regulations. Any other construction of who is `an agent having authority in such matters'; [Zoning Commission v.] Lescynski, supra, [188 Conn. 724] 732; would entirely defeat any and all claims of estoppel. Had the municipal agent's conduct been in conformity with zoning regulations, his legally authorized acts would automatically have conferred indefeasible rights upon the claimant. It is only when the municipal agent acts in good faith, within the scope of his authority, but in error, that the occasion for invocation of estoppel can arise.
Id., 122.
The court held that the acts of the building inspector, CT Page 5869 while clearly in violation of the zoning regulations, were nonetheless official acts within the scope of his authority. Similarly, in the case at bar, the site grading plan was approved by the Commission, upon recommendation of the Town Planner, with the plaintiff present. There is no question about these acts as being conducted by officials within the scope of their authority.
The second issue is whether the acts were erroneous. This court first notes that it has received no evidence that the Commission believed its acts to be erroneous. From the initial approval, through the annual reviews up to September 1991, the Commission never doubted its actions. It interpreted its initial approval as consistent with its regulations. The plaintiff never sought the Commission's approval for the instant litigation — it was solely his decision. (Transcript, pp. 135; 193). Indeed, even after Judge O'Neill's first decision, the Commission did not question its actions. Thus, as far as this court knows, the Commission still believes its actions to be lawful and appropriate, i.e., not erroneous.
Of course, Judge O'Neill did note the obvious, that the "operation is quarrying and the defendant's property contains a large quarry." (Exhibit C). This was noted on appeal by the Supreme Court as well as the fact that the defendant herein did not contest the illegality of the operation of a quarry in a residential zone. Tomasso Bros., Inc. v. October Twenty-Four, Inc., 221 Conn. 194, 196-198 (1992) (Exhibit D). In issuing the preliminary injunction, Judge Goldberg reached a similar conclusion. This court also believes the defendants' actions to be quarrying and, nothwithstanding [notwithstanding] the Commission or the other municipal officials' beliefs, finds that a portion of the premises contains a quarry. As Judge Goldberg noted earlier:
 The word "quarry" is not defined in the Plainville Zoning Regulations. "Where a statute does not define a term, it is appropriate to look to the common understanding expressed in the law and in dictionaries." Kelemen v. Rimrock Corporation, 207 Conn. 599, 604 (1988). Webster's Third New International Dictionary defines quarry as the removal of fragments of rock by impact or by pressure.
CT Page 5870
The Commission did err and should not have issued its original permit.
In determining whether the violation (quarrying in a residential zone) has been unjustifiably induced, this court need only turn to the minutes reviewed earlier. Starting with the January 10, 1978 meeting (Exhibit J), it is clear that the Commission knew it was an R-40 zone and what would be taking place ("taking out rock"). It is also clear that the Commission deemed the activity to be grading and not quarrying. The Commission certainly did not have to grant the application and this was not the first time the Commission approved this type of activity. On January 22, 1980, Town Planner Schaefer noted that "it's another situation similar to the review that you did to Tilcon Tomasso." He further stated, "You did a similar regrading plan only it was into sand rather than into stone material . . . on Tomasso's property." (Exhibit 9a). The Commissioners discussed the fact that stone was being removed and the "difference" between site grading and a quarry. As previously noted, the next year, Mr. Caparelli noted that "it's just an update like Tomasso's." (Exhibit 9b).
This court has previously discussed the Commission's yearly minutes and the testimony of Mr. Dornfried who, in addition to his other statements, stated that he knew the property was in a residential zone from at least 1979 ("almost at the very beginning; within a year after it was approved.") (Transcript, p. 127).
The evidence is overwhelming that the Commission and the Zoning Enforcement Officer knew exactly what was taking place in this residential zone. Even though the defendants did not put on a case, the evidence clearly indicates that the quarrying action was unjustifiably induced. This court is not willing to say that the action of the defendants in applying for and the action of the Commission in approving the initial permit were done in bad faith. The applicant applied to conduct an activity which the Commission believed it could grant and in fact, did so, after open public review. Murach v. Planning and Zoning Commission, 196 Conn. 192, 205 (1985).
Finally, the last test is to determine whether "special circumstances make it highly inequitable or oppressive to enforce the regulations." It could be argued that enjoining the defendants now would cause no injury as they have enjoyed CT Page 5871 fourteen years of "free" rock for use in the defendant A. Aiudi and Sons' concrete business. They would simply have to fill the land and then build on it as anticipated. As noted at trial, it is not this simple.
First, the prayer for relief presumably bars all development activity ("all commercial activity"). The request has never been refined and thus, the injunction would preclude the defendants from filling the hole and further development. Second, the site grading plan was premised on a regrading of the land from 360 foot elevation to about a 370 foot elevation, east to west. (Exhibits J; 9h). The requested injunction would bar this. Third, while there was no evidence as to the value of the remaining rock, the testimony indicated there was at least 100,000 cubic yards or 250,000 tons of rock remaining. This court is sure that it has some value. Judge Goldberg noted the testimony of Mr. Aiudi that if A. Aiudi and Sons was unable to continue to remove rock material from the defendant's site, the cost for obtaining such material for the ready-mix concrete business would be much greater.[7][8]
At the January 10, 1989 meeting, the Commissioners expressed the view that the important issue was the finished elevation, not the amount of rock removed. (Exhibit 9f). The reason was that the town sought to benefit from a technology park development. (Exhibit 9f). The evidence certainly shows that special circumstances exist in this case. The Commission and its zoning enforcement officer, the plaintiff herein, led, even encouraged, both defendants for over fourteen years. This is a far greater time than the five month period alleged in Zoning Commission v. Lescynski, supra, 735. Other than the issues raised before Judge O'Neill, which are not before this court, (and on which this court takes no position), there is simply no reason to allow the enforcement of the zoning prohibition now.
Finally, it must be noted that the Supreme Court commented in its decision that Judge O'Neill "did not pursue the extent to which various municipal rulings might have contributed to the defendants' conduct of their business. . ." Tomasso Bros., Inc. v. October Twenty-Four, Inc., supra, 196. This court has and finds that these actions induced the defendants to act and that it would be highly inequitable to now enforce the zoning regulations. CT Page 5872
 III.
Conclusion
This court, therefore, concludes that the plaintiff has failed to meet its burden of proof. Further, even if he had been successful, the defense of estoppel has been successfully proven.
The temporary injunction earlier issued is hereby vacated. Judgment enters for the defendants.[9]
MARSHALL K. BERGER, JR. JUDGE, SUPERIOR COURT