[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an appeal from the decision of the Planning Zoning Commission of the Town of Salem denying the plaintiffs' application for site plan approval for the construction of a bituminous concrete manufacturing facility on the plaintiffs' land in an industrial zone.
For reasons hereinafter stated the decision appealed from is affirmed.
The appeal comes to the Court under the provisions of General Statutes §§ 8-9 and 8-8. Section 8-8 (b) limits such appeals to persons aggrieved by the decision appealed from. From the evidence it is found that plaintiffs are the owners of the real property involved and that they prepared and filed the site plan, the rejection of which forms the basis of this appeal. It is concluded then that they are aggrieved and have standing to prosecute the appeal. General Statutes § 8-8(1); Hughes v.Town Planning Zoning Commission, 156 Conn. 505, 507-08 (1968).
All notices required by law have been properly given and timely published. No questions concerning jurisdiction have been raised.
The basic facts underlying this appeal may be summarized as follows:
Plaintiffs' property is subject to the zoning regulations of the Town of Salem and is located in an Industrial Zone.
For some time the plaintiffs have operated an earth product excavation and processing facility for the sale of processed earth products on the premises.
The zoning regulations of the Town of Salem are permissive in character. Any use which is not specifically permitted is automatically excluded. Park Regional Corporation v. Town Plan Zoning Commission, 144 Conn. 677, 682 (1957). Section 9 of the regulations sets forth those uses permitted within the Industrial Zone as a matter of right and contains the following subsection: CT Page 6224
"Section 9.1.19, Manufacture of Concrete Products."
Plaintiffs appeared before the Commission at its regular meeting of April 15, 1997, and presented a letter indicating that they were looking to expand their Salem Earth Products business into the manufacture of bituminous concrete. This letter requested the Commission to clarify whether or not such use would be allowed under the provisions of § 9.1.19.
The minutes of the meeting state that the Commission indicated to the plaintiffs that bituminous concrete was a permitted use under § 9.1.19.
Subsequently, the minutes were amended and the Commission altered its position on this point.
After the meeting of April 15, 1997, the plaintiffs went forward with their plans for the construction of a bituminous concrete manufacturing plant. On May 13, 1997, they submitted to the Commission an application for site plan approval for the construction and use of a bituminous concrete manufacturing facility pursuant to the provisions of § 9.1.19 of the regulations
At the Commission's meeting of June 17, 1997, a full presentation was made in support of plaintiffs' site plan application. After discussion of the issues the Commission voted to deny the site plan application stating the reasons on the record.
This appeal ensued.
The appeal involves three interrelated issues which will be addressed separately. These issues are:
(I) Did the Commission correctly interpret its regulations in determining that the manufacture of bituminous concrete was not a permitted use in the Industrial Zone under the Salem Zoning Regulations?
(II) Is the defendant Commission collaterally or equitably estopped from denying the approval of plaintiffs' site plan application? CT Page 6225
(III) Is the action of defendant Commission in denying plaintiffs' site plan application null and void because of conflict of interest and predisposition of certain members of defendant Commission?
 I.
The first issue, which may be the pivotal issue of the case, is whether or not the Commission correctly interpreted its regulations in determining that the manufacture of bituminous concrete was not a permitted use in the Industrial Zone under § 9.1.19 of the regulations. As previously noted, the section allows the manufacture of "concrete products" within the zone.
Plaintiffs, desiring clarification as to whether or not § 9.1.19 permitted the manufacture of bituminous concrete, appeared at the meeting of the Commission held on April 15, 1997. In support of their desire to expand into the manufacture of bituminous concrete products, the plaintiffs presented to the Commission what appears to be a copy of a dictionary page which contained the following pertinent definition of "concrete":
 con-crete\kan-kret.(`) kan'\n (1656) 1: a mass formed by concretion or coalescence of separate particles of matter in one body; 2. A hard strong building material made by mixing a cementing material (as portland cement) and a mineral aggregate (as sand and gravel) with suffficient water to cause the cement to set and bind the entire mass; 3. A waxy essence of flowers prepared by extraction and evaporation and used in perfumery.
In the presentation, plaintiff Roger L. Phillips stressed the first two lines of the definition which mentions separate particles of matter. After some discussion, principally with the chairman of the meeting, plaintiffs were advised without a formal vote that bituminous concrete fell within the definition of "concrete" and its manufacture was allowed under § 9.1.19.
The minutes of the April 15th meeting reflect that there were discussions concerning the meaning of § 9.1.19. There was also testimony that most of the discussion was between plaintiff Roger Phillips and the chairman of the Commission, Mr. Jensen. Other members of the Commission may have been concentrating on other matters. CT Page 6226
After the meeting Deborah Cadwell, a member of the Commission who owned property in close proximity to plaintiffs' earth products plant, began to be concerned that a facility for the manufacture of bituminous concrete would, in fact, be an asphalt plant. She discussed this concern with the town planner and was informed that as a member of the Commission, she could refer the question to the Commission's attorney, Thomas P Byrne. She called and discussed the matter with the attorney who informed her that in his opinion the manufacture of bituminous-concrete was not allowed under the Salem regulations.[1]
The next regular meeting of the Commission was held on April 22, 1997. Near the end of the meeting, Cadwell raised the § 9.1.19 issue and disclosed her conversation with Attorney Byrne.
The minutes of the April 22nd meeting reflect that concerns regarding the definition of concrete presented at the April 15th meeting were discussed and that it was the consensus of the Commission to prepare an amendment to § 9.1.19 for a public hearing on May 20, 1997.
There was evidence that the proposed amendment was prepared by member Larry Stevens. It was approved for consideration by a vote of six to one.
The proposed amendment, as approved, was as follows:
"Add to Section 9.1.19: (New words underlined)
9.1.19 Manufacture of concrete products except for
 bituminous concrete, asphalts and other oil-based products."
The obvious effect of the amendment would be to delete the manufacture of bituminous concrete from the uses authorized under § 9.1.19.
The Commission met again on May 20, 1997. At this time, the minutes of the April 15th, 1997 meeting and the April 22d 1997 meeting were amended by unanimous vote of the Commission as follows:
"APPROVAL OF MINUTES OF PREVIOUS MEETINGS:
 1. April 15, 1997 — Regular Meeting
CT Page 6227
 M/S/C (Giles/Jensen) to approve the minutes of the April 15, 1997 Regular Meeting of the Salem Planning and Zoning Commission amended as follows:
 Page 2, under PETITIONERS, under #1. Phillips-clarification of regulations, add to the following sentence (new words underlined): "Commission stated that, under the first definition provided by the applicant, Sections 9.1.19, which would include bituminous concrete...."
Vote: Approved unanimously.
"2. April 22, 1997 — Regular Meeting
 M/S/C (Mullin/Stevens) to approve the minutes of the April 22d 1997 Salem Planning and Zoning Commission Regular Meeting amended as follows:
 Page 5, under #2. D. Cadwell, amend the vote on the motion to set a Public Hearing regarding an amendment to Section 9.1.19 of the Salem Zoning Regulations concerning the manufacture of concrete products to read (new words underlined): [deletions in brackets]: Vote: [approved unanimously.] For approval — Burnett, Cadwell, Giles, Jensen, Sielman, Stevens. For denial — Mullin. MOTION CARRIED
 Page 5, after the motion to set a Public Hearing regarding an amendment to Section 9.1.19 of the Salem Zoning Regulations concerning the manufacture of concrete products, add (new words underlined): When polled some members did not realize what was meant by bituminous concrete.
Vote: Approved unanimously."
At the request of the chairman, Commission member Stevens requested a formal written opinion from Attorney Byrne on the question as to whether the manufacture of bituminous concrete was a permitted use under § 9.1.19 of the regulations.
Attorney Byrne's reply letter of April 26, 1997, contained the following language in regard to definitions: CT Page 6228
 "The following definitions are those set forth in Webster's New Universal Unabridged Dictionary:
 Concrete — A hard compact substance made of sand, gravel, cement and water used in construction of buildings, dams, bridges, etc.
 Asphalt — A brown or black tar like substance, a variety of bitumen, found in a natural state or obtained by evaporating petroleum; a mixture of this with sand or gravel for cementing, paving, roofing, etc.
 Bitumen — Any of several hard or semi-solid materials obtained as asphaltic residue in the distillation of coal tar, wood tar, petroleum, etc. or occurring as natural asphalt."
Mr. Byrne then went on to state that in his opinion "the manufacture of bituminous concrete (asphalt) is not a permitted principal use of land in the industrial zone under § 9.1.19 of the zoning regulations."
The Commission must have accepted Attorney Byrne's opinion when at the meeting of June 17, 1997, it voted to deny the plaintiffs' site plan application citing the following reason:
 "(1) Asphalt — bituminous concrete plants are not a permitted use in the industrial or any other zone in Salem. Our regulations are permissive in nature and therefore asphalt plants have to be included as expressly permitted uses to be allowed."
A site plan is filed with the Commission to determine the conformity of the proposed building or use with the specific provisions of the zoning regulations. General Statutes §8-3(g); SSM Associates Limited Partnership v. Plan ZoningCommission, 15 Conn. App. 561, 566 (1988). "In [considering] a site plan application, the [Commission] acts in its ministerial capacity. . . . It [has] no independent discretion beyond determining whether the proposed plan complies with the regulations." Allied Plywood Inc. v Planning Zoning Commission,2 Conn. App. 506, 512 (1984), cert. denied, 194 Conn. 808 (1984). A site plan may be denied only if it fails to comply with the requirements already set forth in the zoning regulations. General Statutes § 8-3(g)
Where, as here, a zoning authority has stated its reasons on CT Page 6229 the record, "the reviewing court ought only to determine whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations which the authority was required to apply under the regulations. . . . [I]f any of the reasons supports the action of the Commission, the plaintiffs must fail in the appeal." (Citation omitted; internal quotation marks omitted.) Goldberg v. Zoning Commission,173 Conn. 23, 25-26 (1977).
The issue here involves an interpretation of the zoning regulations. The Court must determine whether the Commission has correctly interpreted its regulations and applied them with reasonable discretion to the facts. Pascale v. Board of ZoningAppeals, 150 Conn. 113, 117 (1962).
The evidence clearly establishes that at the meeting of April 15, 1997, in response to the plaintiffs' request for clarification, the Commission advised plaintiffs that the manufacture of bituminous concrete was permitted under the provisions of § 9.1.19 of the zoning regulations. The evidence also clearly establishes that this clarification was improvidently issued without an understanding of what was involved. Minutes of subsequent meetings show that the members were confused and did not comprehend what was meant by bituminous concrete. To assist them, an opinion was sought from their legal advisor. Attorney Byrne's advice was also sought in regard to the legality of plaintiffs' site plan application. The Commission was entitled to seek such advice, but it could not be binding and any decision would have to be that of the Commission. Spero v ZoningBoard of Appeals, 217 Conn. 435, 444 (1991); Blaker v Planning Zoning Commission, 212 Conn. 471, 478 (1989).
A zoning ordinance is a local legislative enactment, and in its interpretation the question is the intention of the legislative body as found from the words employed in the ordinance. Fox v. Zoning Board of Appeals, 146 Conn. 70, 73
(1958). "The words employed are to be interpreted in their natural and usual meaning." Lawrence v. Zoning Board of Appeals,158 Conn. 509, 511 (1969).
Attorney Byrne's letter dated April 26, 1997, contained definitions from Webster's New Universal Unabridged Dictionary of "Concrete," "Asphalt," and "Bituminous," which could be found to express the natural and usual meaning of the words. The definition of "concrete" in the dictionary indicates that it is a CT Page 6230 mixture of sand, gravel, cement and water and does not include petroleum or asphalt.
This definition is also consistent with the second part of the definition presented by plaintiffs at the April 15th meeting in which concrete is described as:
 "A hard strong building material made by mixing a cementing material (as portland cement) and a mineral aggregate (as sand and gravel) with sufficient water to cause the cement to set and bind the entire mass."
In connection with the site plan application, plaintiffs submitted a document entitled "Pollution Prevention Plan for Hot Mix Asphalt Batch Plant." This document and other information presented in support of the application demonstrate that the manufacture of what plaintiffs called bituminous concrete would entail a process considerably different from the natural and usual meaning of concrete products as expressed in the dictionary definitions supplied by the attorney and by the plaintiffs on April 15th.
The Commission was not required to adopt the technical definition urged by plaintiffs in support of their site plan application.
The Commission determined that a bituminous concrete plant involving asphalt was not a permitted use in the Industrial Zone under the existing regulations.[2] Although this determination differs from the advice given to plaintiffs on April 15, 1997, when the natural and usual meaning of the words used in § 9.1.19 of the zoning regulations is considered, it cannot be found that the Commission was incorrect in its final determination. Since the regulations as correctly interpreted by the Commission did not permit the type of manufacturing plant which the site plan would allow, denial of the site plan was not improper.
 II.
The second issue raised by the plaintiffs is whether or not the Commission is collaterally or equitably estopped from denying approval of plaintiffs' site plan application. Although there is a question as to whether this issue has been properly raised by pleadings, it has been briefed and will be considered. Dornfriedv October Twenty-Four Inc., 230 Conn. 622, 629 (1994). CT Page 6231
This issue arises out of the undisputed fact that plaintiffs appeared before the Commission on April 15, 1997 seeking clarification as to whether § 9.1.19 of the regulations would allow the manufacture of bituminous concrete. Upon being informed by the Commission that § 9.1.19 would allow the manufacture of this product, plaintiffs engaged engineering and technical firms and an attorney at considerable expense to develop the site plan for such purpose, which was presented for approval on May 13, 1997. As previously noted, on June 17, 1997, the Commission denied the site plan application stating that bituminous concrete plants were not permitted under the regulations.
Estoppel is frequently raised as a defense against enforcement of land use regulations. It is, in effect, a way of preventing the application of the regulations of the Commission due to special circumstances of the case. Apparently, however, no Connecticut land use decision has ever upheld such a defense against a municipality. Tondro, Connecticut Land Use Regulations (2d Ed. 1992), p. 586.
"The doctrine of collateral estoppel, or issue preclusion, provides that if an issue of fact or law is actually litigated and determined by a valid and final judgment, the determination is conclusive in a subsequent action between the same parties. . . ." (Internal quotation marks omitted.) Upjohn Co. v.Planning Zoning Commission, 224 Conn. 82, 93 (1992). This theory of law requires a showing of actual litigation and a final judgment.
The opinion rendered by the Commission at its meeting of April 15th could not be considered a product of actual litigation or a final judgment, therefore, collateral estoppel is not appropriate. P.X. Restaurant Inc. v. Windsor, 189 Conn. 153, 161
(1983).
Plaintiffs also claim that the Commission is equitably estopped from denying approval of the site plan. In discussing equitable estoppel against the enforcement of zoning regulations, the Supreme Court has stated that "[u]nder our well-established law, any claim of estoppel is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury . . . Although CT Page 6232 estoppel may not generally be invoked against a public agency in the exercise of its governmental functions, . . . an exception is made where the party claiming estoppel would be subjected to a substantial loss if the municipality were permitted to negate the acts of its agents . . . Estoppel against municipalities is therefore limited and may be involved against the enforcement of zoning regulations (1) only with great caution, (2) only then the resulting violation has been unjustifiably induced by an agent having authority in such matters, and (3) only when special circumstances make it highly inequitable or oppressive to enforce the regulations." (Citations omitted.) Zoning Commission v.Lescynski, 188 Conn. 724, 731-32 (1982).
Without deciding whether any of the other elements required to invoke equitable estoppel against the municipality have been proven, it cannot be found that plaintiffs suffered a substantial loss due to the denial of the site plan application. What is meant by substantial loss was discussed in Dornfried v. OctoberTwenty-Four Inc, supra, 230 Conn. 639. There, the court relied onCities Service Oil Co. v. Des Plaines, 21 III.2d 157, 161,171 N.E.2d 605 (1961). That case involved the substantial completion of construction of a gasoline station and the installation of underground tanks. In finding substantial loss, the Illinois court reviewed cases in which enforcement of regulations would necessitate removal of an apartment building and a garage. The court in Dornfried also cited Dupuis v Submarine Base CreditUnion Inc.; 170 Conn. 353, 354 (1976); in which a claim of equitable estoppel was raised involved a fully constructed office building.
No doubt plaintiffs expended a considerable amount of money in preparing and presenting the site plan application. Such expenditures, however, could not be considered as a substantial loss under the above cases.
It is noted also that almost without exception, the cases reviewed in connection with this issue involved injunctions. Plaintiffs here are not seeking an injunction but are proceeding with an administrative appeal claiming to be aggrieved under the provisions of General Statutes § 8-8. In proceeding under § 8-8, the Court is limited by the provisions of the statute. Section 8-8(I) provides that after hearing the court may "reverse or affirm, wholly or partly, or may modify or revise the decision appealed from." It must be concluded that relief based upon a claim of estoppel is outside of the scope of review and the CT Page 6233 relief which can be considered under the provisions of § 8-8.
 III.
The third issue raised by the plaintiffs is whether the action of the Commission in denying the site plan application, is null and void because of conflict of interest and predisposition of certain members of the Commission.
Plaintiffs claim that Commission member Deborah Cadwell had a conflict of interest and that Commission member Larry Stevens acted under a predisposition against the site plan. It is also claimed that the conduct of the Commission as a whole showed a bias which deprived the plaintiffs of an impartial consideration of the site plan application.
For an equitable determination of these issues, additional testimony outside of the record was received. General Statutes § 8-8(k).
General Statutes § 8-11 provides, in pertinent part, that no member of any zoning commission "shall participate in the hearing or decisions of the board or commission of which he is a member upon any matter in which he is directly or indirectly interested in a personal or financial sense." In deciding such matters, the question is whether the commissioner's public duty as a member of the zoning commission so conflicted with the commissioner's private interest that fairness and impartiality of the proceedings are called into question. "Public office is a trust conferred by public authority for a public purpose." Low v.Madison, 135 Conn. 1, 8 (1948).
The evidence concerning the claimed conflict of interest of Commissioner Cadwell indicates that she owns a campground across the street from the plaintiffs' proposed bituminous concrete manufacturing site. As noted in connection with the first issue, Commissioner Cadwell was present at the April 15, 1997 meeting. She knew concrete had been discussed. On reflection, she thought that a mistake may have been made. She began to be concerned that the manufacture of bituminous concrete would involve an asphalt plant. She discussed this concern with the town planner who informed her that as a member of the Commission she was authorized to refer the question to the Commission's attorney. She called the attorney identifying herself as a member of the Commission. After some discussion, Cadwell was informed by the CT Page 6234 attorney that, in his opinion, the manufacture of bituminous concrete was not allowed under the Salem zoning regulations.
At this point, Cadwell had discussed the question only with Attorney Byrne and the town planner.
Just prior to the start of the next regular meeting of the Commission on April 22, 1997, Cadwell again discussed the issue with the town planner. She was informed that the matter could be raised at the meeting. She discussed it with the recording secretary and asked her to put the matter on the agenda for clarification of the action taken at the April 15th meeting. This was done, but it did not come up for discussion until near the end of the meeting after the regularly scheduled business had been completed.
The discussions concerning the definition of "concrete" as used in § 9.1.19 revealed that the members of the Commission were confused and were concerned about what had occurred on April 15th. They were not certain of the meaning of the word as used in the regulations. The consensus was that the regulations should allow the manufacture of concrete products but not asphalt plants. There was some discussion that such facilities could be allowed by special permit.
Larry Stevens, vice chairman and an 18-year member of the Commission had not attended the April 15th meeting. From the discussion he recognized that the members were concerned about what had happened at the April 15th meeting and were uncertain of the meaning of § 9.1.19. He proposed an amendment to clarify the section by excepting bituminous concrete, asphalt and other oil-based products from the ambit of the regulations. The public hearing on the amendment case was scheduled for May 20, 1997. See General Statutes § 8-3.
Plaintiffs' site plan application was filed on May 13, 1997, and was also scheduled for consideration at the May 20, 1997 meeting. The proposed amendment to § 9.1.19 could not affect the site plan application. See General Statutes § 8-2h.
At the start of the May 20th meeting, Commissioner Cadwell withdrew from the Commission and was replaced by an alternate. She refrained from any personal participation in the hearing on the amendment and from any participation of the site plan application. She was, however, represented by an attorney who CT Page 6235 spoke in favor of the amendment.
At the request of the chairman, Commissioner Stevens read a written statement at the start of the meeting. The purpose of the statement was to inform the public as to what had happened and to spell out that there were two separate items before the meeting, the amendment and the site plan application.
There was a long public hearing on the amendment and when the site plan application came up, it was agreed to reschedule consideration until the next meeting on June 17, 1997.
After the site plan application had been filed, Cadwell had it reviewed by an engineering firm. From this report, she concluded that the granting of the site plan would have an adverse effect on her property. She showed the engineer's report to Commissioner Stevens who saw no problem in that. His main concern at the time was whether the manufacture of bituminous concrete was allowed under the regulations.
At the start of the next meeting held on June 17, 1997, Cadwell again withdrew from the Commission and did not participate in the consideration of the site plan application.
A detailed presentation was then made by plaintiffs in favor of granting the site plan application.
Prior to the meeting, the Commission chairman asked Pare Engineering, a firm regularly used by the Commission for such purposes, to review the site plan application. Pare Engineering's report, which was not favorable to the application, was received on the afternoon of the meeting. The report was presented at the meeting and plaintiffs' attorney had an opportunity to review it. The attorney complained that he did not have an opportunity to examine the report prior to the meeting. He did not, however, request a recess or continuance so that he could review it with plaintiffs' engineer.
Commissioner Stevens' prime concern was whether the manufacture of bituminous concrete was allowable under the regulations. He was also concerned about chemicals which would be stored on the site and possible spills. He had notes describing his concerns, and prior to the meeting he had them typed. At the conclusion of plaintiffs' presentation he read the statement and moved to deny the site plan application. CT Page 6236
The motion was withdrawn to allow plaintiffs' attorney to speak further. The attorney spoke and asked Stevens to disqualify himself because of the prepared statement. Commissioner Stevens refused.
Next followed a lengthy discussion by the Commission on the issues. This discussion was followed by a vote denying the site plan application for the reason noted.
There is no doubt but that Commission member Deborah Cadwell had a direct personal, and possibly financial, interest in the outcome of plaintiffs' site plan application. It cannot be found, however, that she violated the provisions of General Statutes § 8-11.
Her action in contacting Attorney Byrne and raising the question as to whether plaintiffs had been given the correct definition of "concrete" as used in § 9.1.19, triggered the situation which brought about the amendment and was a factor in the ultimate conclusion that the manufacture of bituminous concrete was not a permitted use. Cadwell took these prudent steps out of concern that an error had been made and that the members of the Commission were not fully aware of the situation.
At the time Cadwell raised the issue, during the meeting of April 22, 1997, plaintiffs' site plan application had not yet been filed and there was nothing pending before the Commission Thereafter, when the site plan application was filed on May 13, 1997, and came before the Commission on May 20, 1997, and June 17, 1997, Cadwell withdrew from the Commission and took no part in the proceeding.
Plaintiffs attempted to portray the delay in bringing up Cadwell's concerns about § 9.1.19 until near the end of the meeting of April 22, 1997, as a nefarious plot to hide the matter from public scrutiny. The evidence, however, does not bear this out. The delay was the normal result of trying to schedule a last minute item.
On the separate item of the amendment Cadwell also withdrew from the Commission. She did have an attorney speak in favor of the amendment. Section 8-11 does not prohibit a member who is not participating in a matter from presenting their own view on the subject. Massimo v Planning Commission, 41 Conn. Sup. 196, CT Page 6237 197-200 (1989).
It is also claimed that Commissioner Stevens, who participated in the consideration of the site plan application and voted against it, was biased and should have disqualified himself. The evidence, however, does not support this. The evidence indicates that Stevens did not approach the problem with a closed mind. He stated that he wanted to do what was best. He was aware that other towns had been embroiled in litigation over asphalt plants. He had concerns about chemicals on the site and he was aware of Attorney Byrne's opinion concerning § 9.1.19.
"The law does not require that members of zoning commissions must have no opinion concerning the proper development of their communities. It would be strange, indeed, if this were true."Furtney v. Zoning Commission, 159 Conn. 585, 594 (1970). As the court noted in In re J. P. Linahan. Inc., 138 F.2d 650, 651-52
(2d Cir. 1943), "[t]he human mind . . . is no blank piece of paper. . . . Interests, points of view, preferences, are the essence of living. . . . An `open mind,' in the sense of a mind containing no preconceptions whatever, would be a mind incapable of learning anything, [and] would be that of an utterly emotionless human being. . . ."
"Local governments, therefore, would be seriously handicapped if any conceivable interest, no matter how remote and speculative, would require the disqualification of a zoning official. Such a policy would not only discourage but might even prevent capable men and women from serving as members of the various zoning authorities. Of course, courts should scrutinize the circumstances with great care and should condemn anything which indicates the likelihood of corruption or favoritism." (Internal quotation marks omitted.) Cioffoletti v. Planning Zoning Commission, 209 Conn. 544, 555 (1989).
The fact that Commissioner Stevens may have taken a tentative position on the site plan and that he reduced his concerns to writing does not establish that he had predetermined the questions and was irrevocably committed to rejecting the site plan. Young v. Town Planning Zoning Commission, 151 Conn. 235,242-43 (1963).
It cannot be concluded that Commissioner Stevens, in voting against approval of plaintiffs' site plan acted under a predisposition against the site plan. CT Page 6238
Plaintiffs also contend that the Commission, as a whole, acted under a bias which deprived them of an impartial consideration of the site plan. The evidence, however, does not support a conclusion that the Commission acted under a predetermination or were irrevocably committed to a denial of the site plan no matter what the evidence might show. Daviau v.Planning Commission, 174 Conn. 354, 358 (1978).
The evidence shows that there was concern on the part of the Commission over what was allowed under § 9.1.19 and whether the correct information had been given to plaintiffs at the April 15th meeting. The amendments to the minutes reflect this.
The fact that the amendment was proposed to clarify what was allowed under § 9.1.19 indicates that the Commission had not predetermined the issue. If the Commission had been irrevocably committed to the proposition that the manufacture of bituminous concrete was not allowed under § 9.1.19, the amendment would not have been necessary.
The handling of the engineering report complained of by plaintiffs does not reflect bias and is of no significance since rejection of the site plan was based only on the interpretation of the regulations.
The minutes of the June 17th meeting also negate any finding that the Commission had predetermined the issue. At the conclusion of plaintiffs' presentations, several members indicated that they were not sure they were ready to vote. A lengthy discussion then followed concerning whether the manufacture of bituminous concrete was a permitted use in the Industrial Zone and whether it could be considered an accessory use to plaintiffs' cement operation.
The vote was taken only after the discussions had been concluded and the vote was not unanimous.
The evidence indicates that plaintiffs were given a fair hearing and that the Commission did not act out of predetermination or bias.
Plaintiffs claim that the action of the Commission in denying their site plan application should be declared null and void because of conflict of interest and predetermination. The CT Page 6239 evidence has not established these claims. However, even if the claims had been proven, there is a question as to what relief this would afford plaintiffs where the zoning is permissive and the regulations do not allow the manufacture of bituminous concrete. R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (1993), § 47.3, pp. 757-63.
 IV.
Accordingly, the issue having been found for the defendant Commission the decision appealed from is affirmed.
Joseph J. Purtill Judge Trial Referee